## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ZHAOCHENG ANTHONY TAN,
and

GARRETT REID,

     *Petitioners*,

     v.

DONALD TRUMP, in his official
capacity as President of the
United States, and

PAM BONDI, in her official
capacity as Attorney General,

     *Respondents*.

Case No. ____26-1047____

## PETITION FOR REVIEW OF LEGALITY OF ACTIONS ARISING UNDER THE PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

## I.    Introduction

1.    TikTok is an enormously popular social media app. About 170 million Americans, and nearly a quarter of the entire world population, use it every month. TikTok was created by a Chinese company, ByteDance, Ltd., and in recent years, politicians have expressed concern that the ubiquitous app could serve as a platform for spreading Chinese government propaganda inside the United States. In 2024, Congress passed, and the President signed, a law prohibiting TikTok's distribution in the United States unless ByteDance severed itself from the app's domestic operations. Protecting Americans From Foreign Adversary Controlled Applications Act, H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024) (the "TikTok Law," attached as Exhibit A). Under the law, TikTok had until January 19, 2025 to find a new corporate home, or face hundreds of billions of dollars in fines.

2.    The law was clear, but it was never enforced. Shortly after the deadline to divest passed, President Trump issued an executive order purportedly granting an extension for TikTok to find a domestic owner and directed his Attorney General not to enforce the law. In the subsequent months, President Trump issued four more extensions, all contrary to the plain text of the law, and all directing

1

the Attorney General (also contrary to the statute) to conduct no investigation into the law's violation.

3.    On January 22, 2026—more than a year after the deadline set by law—a new joint venture announced that a deal had been reached for TikTok's domestic operations. Under the deal, TikTok's American assets would be acquired by companies including Oracle, MGX, Susquehanna International Group, and General Atlantic, each of which, directly or through their leaders, contributed millions to the President's political projects or invested billions in his personal businesses. These companies acquired TikTok at a price so low that one analyst called the deal "daylight robbery."

4.    This deal, like the many extensions that preceded it, facially violated the law. Under the statute, ByteDance cannot have an ongoing "operational relationship" with TikTok's severed American operations. But in fact, under the announced deal, ByteDance would continue to own the app's essential recommendation algorithm, and would license it to the new American TikTok entity. ByteDance would continue to operate the new American TikTok entity's e-commerce, marketing, and advertising operations. And the CEO of TikTok's global operations, which is still

owned by ByteDance, would even sit on the new American entity's board.

5.    In short, under the announced deal, ByteDance would still control all the essential elements of TikTok. Such a deal would subvert the very purpose of the TikTok Law, as ByteDance could continue to push Chinese propaganda and censor the content it does not like, exactly the harm that the law was intended to prevent.

6.    Such relentless violation of the law has harmed Petitioners, who have invested in companies that compete with TikTok's American operations. When the illegal sale was announced, Petitioners suffered financially. By sanctioning an unlawful deal, the government has created a legal impediment to Petitioners' financial recovery. Petitioners therefore seek to have the government follow the law, rescind its endorsement of an illegal deal, and investigate violations of the law as required by statute.

7.    For the law to mean something, it must be followed, even—perhaps especially—by the President. Respondents have violated the statute and subverted the will of Congress. Petitioners bring this case to ensure that such violations, and such subversion, do not continue.

## II.    The Parties

8.    Petitioner Zhaocheng Anthony Tan is a software engineer and resident of California. He is a shareholder in Alphabet Inc.

9.    Petitioner Garrett Reid is a software engineer and resident of California. He is a shareholder in Meta Platforms, Inc.

10.    Respondent Donald J. Trump is the President of the United States, and is sued in his official capacity. As President, Trump granted unlawful extensions for companies to comply with the law requiring TikTok's divestiture, and ultimately approved a sale of TikTok's American assets in a deal that violated the statute.

11.    Respondent Pam Bondi is Attorney General, and is sued in her official capacity. Attorney General Bondi failed to investigate violations of the TikTok Law, as was required by statute.

## III.    Jurisdiction

12.    This Court has original jurisdiction over challenges, such as this Petition, to any action, finding, or determination under the TikTok Law. TikTok Law §§ 3(a), (b). This Court has further jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202.

4

## IV. Facts

### a. Background

13.    TikTok is a social media app through which users make and watch short videos. TikTok is powered by a "proprietary algorithm that recommends videos to a user based on the user's interactions with the platform." *TikTok Inc. v. Garland*, 604 U.S. 56, 63 (2025). "Each interaction a user has on TikTok—watching a video, following an account, leaving a comment—enables the recommendation system to further tailor a personalized content feed." *Id.*

14.    This recommendation algorithm—the tool by which TikTok pushes content that it believes will most appeal to each user—is notoriously effective: one journalist gushed that the app "Reads Your Mind." As a result, TikTok has about 1.9 billion users globally (about a quarter of the entire world population), and 170 million users here in the United States.

15.    TikTok was created by ByteDance, a Chinese company, and American politicians and national security officials have increasingly voiced their concerns that TikTok could be used to access Americans' sensitive data and push Chinese government propaganda onto American users.

5

16.     This is not a speculative risk. As the Supreme Court subsequently explained, "China has engaged in extensive and years-long efforts to accumulate structured datasets, in particular on U. S. persons, to support its intelligence and counterintelligence operations." *TikTok*, 604 U.S. at 75 (internal quotation marks omitted).

17.     Willingly or not, ByteDance can be roped into this effort, as it "is subject to Chinese laws that require it to assist or cooperate with the Chinese Government's intelligence work and to ensure that the Chinese Government has the power to access and control private data' the company holds." *Id.* at 63–64. (internal quotation marks omitted). As a result, "TikTok would try to comply if the [Chinese Government] asked for specific actions to be taken to manipulate content for censorship, propaganda, or other malign purposes in the United States." *TikTok Inc. v. Garland*, 122 F.4th 930, 960–61 (D.C. Cir. 2025) (internal quotations omitted).

18.     Facing these concerns, bipartisan coalitions of members of Congress began introducing bills to ban Chinese ownership of TikTok's U.S. operations, culminating in the "Protecting Americans from Foreign Adversary Controlled Applications Act." The law prohibits U.S. companies from hosting TikTok's services, or offering

TikTok in their app stores, unless TikTok's U.S. operations are severed from its Chinese parent. Rolled into a larger defense spending package, the bill passed with bipartisan support, and was signed by President Biden on April 24, 2024. H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50 (Apr. 24, 2024).

19.    ByteDance challenged the law, alleging that the statute violated, among other things, the First and Fourteenth Amendments. This Court upheld the law, and the Supreme Court affirmed. *TikTok Inc. v. Garland*, 122 F.4th 930 (D.C. Cir.), *aff'd*, 604 U.S. 56 (2025). As the Supreme Court explained, "The Act's prohibitions and divestiture requirement are designed to prevent China—a designated foreign adversary—from leveraging its control over ByteDance Ltd. to capture the personal data of U. S. TikTok users." *TikTok*, 604 U.S. at 74 (2025). It added:

> The prohibitions [of the TikTok Law] account for the fact that, absent a qualified divestiture, TikTok's very operation in the United States implicates the Government's data collection concerns, while the requirements that make a divestiture 'qualified' ensure that those concerns are addressed before TikTok resumes U. S. operations. Neither the prohibitions nor the divestiture requirement, moreover, is substantially broader than necessary to achieve this national security objective. Rather than ban TikTok outright, the Act imposes a conditional ban. The prohibitions prevent China from gathering data from U. S. TikTok users unless and until a qualified divestiture severs China's control.

*TikTok*, 604 U.S. at 77.

20.    Collectively, Congress passed, the President signed, and the Supreme Court affirmed the legality of the statute. Companies, all three branches of the federal government directed, must comply with the requirements of the TikTok Law.

### b. The Requirements of the TikTok Law

21.    As relevant here, the TikTok Law requires three things.

22.    **Divestiture requirement.** The TikTok Law prohibits distributing, maintaining, or updating within the United States any "foreign adversary controlled application," which includes any website or application controlled by ByteDance, Ltd. TikTok Law at §§ 2(a)(1), 2(g)(3).

23.    This prohibition does not apply, however, when there is a "qualified divestiture" of the application. *Id.* at § 2(c)(1). For a divestiture to qualify, the President must determine that the application is no longer controlled by a foreign adversary, and that there is no "operational relationship" between the severed application and any formerly affiliated entities controlled by a foreign adversary. *Id.* at § 2(g)(6). An operational relationship includes "any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." *Id.*

8

24.    **Time requirement.** As written, the TikTok Law's prohibitions go into effect 270 days after the enactment of the law, *Id.* at § 2(a)(2)(A). The President may grant a "1-time extension" of "not more than 90 days" if the President certifies to Congress that:

> a. A "path to executing the qualified divestiture has been identified;"
>
> b. Evidence of "significant progress" towards such a divestiture has been produced; and
>
> c. "[T]here are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension."
>
> *Id.* § 2(a)(3).

25.    In sum, the President may extend the TikTok law's statutory deadline, just once, and by up to 90 days, only if he certifies to Congress that, among other things, there are already binding legal agreements to execute the qualified divestiture.

26.    **Enforcement requirement.** Entities that distribute, maintain, or update covered applications are subject to a civil penalty of up to $5,000 for each user of the applications in the United States. *Id.* at § 2(d)(1)(A). For TikTok, with 170 million domestic users, this would come to $850 billion in civil penalties. Unusual for statutory

language, the law directs that the Attorney General "shall" conduct investigations related to potential violations of the law, and if she determines that a violation has occurred, "shall" pursue enforcement of the law. *Id.* at § 2(d)(2)(A). Conversely, in the next paragraph the law permits that the Attorney General "may" bring an action in federal court for appropriate relief, emphasizing that the "shall" language is, indeed, a directive to the Attorney General to act. *Id.* at § 2(d)(2)(B).

## V.   The President Repeatedly Violates the TikTok Law

27.   The TikTok law was signed by President Biden on April 24, 2024, putting the divestiture deadline at January 19, 2025. Given that the deadline was one day before the presidential inauguration, a Biden administration official said that the President would defer on any extension decision to President-elect Trump.

28.   ByteDance did not divest its U.S. operations, and so on January 18, 2025, TikTok made its services temporarily unavailable in the United States, and TikTok was removed from Apple and Google's app stores. A few hours later, President-elect Trump announced that he would grant an extension for the divestiture, and TikTok's services were quickly restored.

29.    On January 20, 2025, President Trump issued an executive order purportedly granting a 75-day extension to the divestiture requirement. Exec. Order No. 14166, Application Of Protecting Americans From Foreign Adversary Controlled Applications Act To TikTok, 90 Fed. Reg. 8611 (Jan. 20, 2025). Contrary to the requirements of the law, however, the President did not in his executive order certify to Congress any of the necessary findings for granting an extension. Specifically, he did not certify that a path to executing a qualified divestiture of TikTok had been identified, that there had been significant progress to executing that divestiture, or that there were binding legal agreements to enable the divestiture during the extension. Additionally, the order directed "the Attorney General not to take any action on behalf of the United States to enforce the" TikTok law, contradicting the direction of the law itself. *Id.*

30.    On April 4, 2025, five days before his first extension was set to expire, President Trump issued a second executive order purportedly granting another 75-day extension. Exec. Order No. 14258, Extending the TikTok Enforcement Delay, 90 Fed. Reg. 15209 (Apr. 4, 2025). Notably, the TikTok law allowed only a "1-time"

11

extension of 90 days. This was a second extension, together totaling 150 days, facially violating the requirements of the law.

31.    As with the first order, President Trump failed to make the necessary certifications to Congress that a divestiture deal was forthcoming. And as with the first order, the President directed the Attorney General specifically not to enforce the law, announcing that "the Department of Justice shall take no action to enforce the [TikTok Law] or impose any penalties against any entity for any noncompliance with the Act." *Id.* In fact, the Order directed that "even after the expiration of the above-specified period, the Department of Justice shall not take any action to enforce the Act." *Id.* In other words, the President indefinitely directed that the law not be enforced.

32.    On June 19, 2025, President Trump issued a third extension, this time for 90 days (240 days total). Exec. Order No. 14310, Further Extending the TikTok Enforcement Delay, 90 Fed. Reg. 26913 (June 19, 2025). Again, President Trump did not make any of the certifications as required by the law. And again, the President directed that the Attorney General specifically not enforce the law.

33.    On September 16, 2025, President Trump issued a fourth purported extension, again for 90 days (330 days total). Exec. Order No. 14310, Further Extending the TikTok Enforcement Delay, 90 Fed. Reg. 26913 (Sept. 16, 2025). Once again, President Trump did not make any of the certifications as required by the law. Once again, the President directed that the Attorney General specifically not enforce the law.

34.    On September 25, 2025, President Trump issued a fifth purported extension, this time for 120 days. Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). Yet again, he failed to make the necessary certifications as required by law, and yet again, he directed the Attorney General not to enforce the law.

35.    In this September Order, President Trump announced a generic "framework" for a sale that he said would, once completed, constitute a "qualified divestiture" under the TikTok Law. *Id.* The "framework" did not say, however, what assets would be sold, or even who would buy them (the buyers were not announced).

36.    The President conceded that this announced framework by itself did not constitute a "qualified divestiture." Instead, he determined "that the divestiture of the applications outlined in the

Framework Agreement, *once its implementation agreements are executed*, is a 'qualified divestiture' under the [TikTok law]." *Id.* (emphasis added). In other words, the President acknowledged that a qualified divestiture had not yet occurred, nearly a year after the deadline for approving one had passed.

37.    On January 22, 2026, a new legal entity, TikTok USDS Joint Venture LLC ("TikTok U.S."), announced that a deal to sell the company's domestic assets had finally been reached, more than a year after the statutory deadline for doing so had passed. In its announcement, TikTok U.S. explained that ByteDance would continue to own 19.9% of the company, while three primary investors—Oracle, MGX, and Silver Lake—would each hold 15% of the company. A range of other investors, including affiliates of Susquehanna International Group, LLP, General Atlantic, and Dell Technologies founder Michael Dell, rounded out the ownership group.

38.    On Truth Social that day, President Trump announced his approval of the deal, saying that "I am so happy to have helped in saving TikTok! It will now be owned by a group of Great American Patriots and Investors, the Biggest in the World, and will be an important Voice." Donald Trump (@realDonaldTrump), Truth Social (Jan 22, 2026, 9:52 PM),

https://truthsocial.com/@realDonaldTrump/posts/11594214780368467
5. Emphasizing that this deal concluded the government's review, he thanked members of his administration who "helped bring this Deal to a very dramatic, final, and beautiful conclusion," as well as "President Xi, of China, for working with us and, ultimately, approving the Deal." *Id.* Consistent with his September Executive Order, this deal now, according to the President, purportedly constituted a qualified divestiture under the TikTok Law.

### a. The Deal The President Approved Violates The TikTok Law

39.    The deal that the President approved on January 22, 2026 facially violated the TikTok Law.

40.    *First*, under the deal, TikTok U.S. would not own the app's recommendation algorithm. Rather, ByteDance would continue to own the algorithm, which it would license to TikTok U.S. In turn, TikTok U.S. would simply "retrain, test, and update" the algorithm on user data stored in the United States. *Announcement from the new TikTok USDS Joint Venture LLC*, TikTok USDS Joint Venture LLC (Jan. 22, 2026), https://newsroom.tiktok.com/announcement-from-the-new-tiktok-usds-joint-venture-llc; *see also* David McCabe and Emmett Lindner, *TikTok Strikes Deal for New U.S. Entity,*

15

*Ending Long Legal Saga*, N.Y. Times (Jan. 23, 2023),

https://www.nytimes.com/2026/01/22/technology/tiktok-deal-oracle-

bytedance-china-us.html ("In addition to its stake, ByteDance will

keep TikTok's coveted algorithm, which it will license to the new U.S.

entity."). This violated the TikTok Law's direction that the U.S.

entity not have any "operational relationship" with its formerly

affiliated entities, "including any cooperation with respect to the

operation of a content recommendation algorithm or an agreement

with respect to data sharing." TikTok Law at § 2(g)(6).

    41.    *Second*, TikTok U.S. announced that existing ByteDance

subsidiaries based in the United States—not TikTok U.S. itself—

"will manage global product interoperability and certain commercial

activities, including e-commerce, advertising, and marketing."

*Announcement from the new TikTok USDS Joint Venture LLC*,

TikTok USDS Joint Venture LLC (Jan. 22, 2026),

https://newsroom.tiktok.com/announcement-from-the-new-tiktok-

usds-joint-venture-llc. This meant that ByteDance, not TikTok U.S.,

would be responsible for the latter company's interoperability and

various crucial commercial operations. ByteDance's continuing

operation of TikTok U.S.'s interoperations, e-commerce operations,

advertising operations, and marketing operations constitute an ongoing "operational relationship" prohibited under the law.

42.    *Third*, TikTok U.S.'s board would include Shou Chew, who is the CEO and a director of ByteDance's global TikTok subsidiary. As a board member, Chew can help choose senior personnel for TikTok U.S. and their compensation; approve proposed budgets, mergers, and dividends; oversee the company's legal and compliance operations; and select the company's strategic direction. Because a ByteDance executive would direct TikTok U.S. on its board, this constitutes yet another "operational relationship" prohibited by the law.

43.    In addition to violating the law, the deal that President Trump approved on January 22, 2026 was materially and obviously different than the "framework" he endorsed the previous September.

44.    *First*, in September, the President announced that "This new joint venture will be run by a new board of directors." Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). This is false. Shou Chew is the CEO and director of ByteDance's continuing TikTok operations, yet also serves as a director on the board of TikTok U.S.

45. *Second*, in September, the President announced that "the divestiture puts the operation of the algorithms and code, as well as content-moderation decisions, under the control of the new joint venture." *Id.* This too is false. ByteDance continues to own and operate the recommendation algorithm for TikTok U.S.

46. *Third*, in September, the President announced that that the divestiture "precludes any 'operational relationship' between a formerly affiliated entity controlled by a foreign adversary and the new joint venture." *Id.* This is false for the reasons discussed above. Not only will ByteDance continue to own and license the underlying algorithm, it will also continue to operate the domestic company's interoperations, e-commerce, marketing, and advertising operations.

47. Additionally, the TikTok Law directed that the Attorney General "shall conduct investigations related to potential violations." TikTok Law § 2(d)(2). But despite the fact that the deal approved on January 22, 2026 facially violated the law, the Attorney General conducted no announced investigation into the deal as a potential violation, as was required by the statute. This failure to investigate remains an ongoing violation of the law.

### b. The Deal The President Approved Rewarded Allies Who Personally Enriched Him

48.    As discussed, the investors in the deal approved on January 22, 2026 include Oracle, MGX, and affiliates of Susquehanna International Group, LLP and General Atlantic, among other companies. These firms or their leaders have close ties to the President, and have at times personally enriched him.

49.    **Oracle.** Oracle co-founder and chairman Larry Ellison previously hosted a $100,000-per-person fundraiser for Trump at Ellison's estate. He and his son David purchased CBS News, which the elder Ellison has assured President Trump he would make a more conservative outlet. And with financial backing from his father, David Ellison is now trying to buy Warner Bros. Discovery, an acquisition requiring approval from the Trump administration.

50.    **MGX.** MGX, an investment firm backed by the United Arab Emirates' sovereign wealth fund, previously paid for a $2 billion investment in the cryptocurrency company Binance using the Trump family's cryptocurrency, USD1. This massive, highly unusual purchase of a new currency increased USD1's legitimacy, and allowed President Trump's crypto business, World Liberty Financial, to generate interest income on the investment.

19

51. **Susquehanna.** Susquehanna's founder Jeff Yass donated $16 million to Trump's Super PAC, MAGA, Inc. Susquehanna itself was the largest shareholder in the company that merged with Donald Trump's media company, Trump Media & Technology Group. If Yass retained his stake in the merged company (it has not been disclosed), his firm is one of the largest institutional shareholders in Trump Media.

52. **General Atlantic.** William Ford, the CEO of General Atlantic, gave $1.25 million to Trump's primary political action committee, MAGA, Inc.

53. In turn, President Trump's approval of the TikTok sale has enriched these companies and executives. These firms bought TikTok for just $14 billion. ByteDance itself is worth $300 billion, and analysts valued the sale of TikTok's U.S. operations at $40-$50 billion. At just $14 billion, TikTok U.S.'s ultimate sale price valued the company at just 1.4 times its annual sales. By comparison, YouTube's value is roughly eight times its annual sales, and Instagram is roughly ten times. One analyst described TikTok's low purchase price as "daylight robbery." *TikTok's $14 billion price tag in Trump deal stuns investors*, Bloomberg (Sept. 26, 2025), https://archive.is/20250926054336/https://www.bloomberg.com/news/

articles/2025-09-26/prized-tiktok-business-valued-like-boring-blue-chip-in-us-deal. Another major investor observed that the deal "could be the most undervalued tech acquisition of the decade." John Cassidy, *Donald Trump's TikTok Deal Looks Like Crony Capitalism*, New Yorker (Sept. 29, 2025), https://www.newyorker.com/news/the-financial-page/donald-trumps-tiktok-deal-looks-like-crony-capitalism.

### c. The TikTok Sale Harmed Investors In TikTok's Competitors

54.    Petitioner Zhaocheng Anthony Tan is an investor in Alphabet Inc., the parent company of YouTube. Petitioner Garrett Reid is an investor in Meta Platforms, Inc., the parent company of Instagram.

55.    YouTube and Instagram compete with TikTok for sharing and viewing videos. For this reason, financial analysts overwhelmingly expected that these companies would benefit from TikTok's ban in the U.S. *See, e.g.*, Andrew Ross Sorkin *et al.*, *Who Stands to Gain from a TikTok Ban*, N.Y. Times (Apr. 24, 2025), https://www.nytimes.com/2024/04/24/business/dealbook/tiktok-ban-bill-bytedance.html ("Who would benefit? The clear answer is Meta and Google."). Mike Isaac, Nico Grant, and Kate Conger, *Instagram and YouTube Prepare to Benefit From a TikTok Ban*, N.Y. Times

(Jan. 17, 2025),

https://www.nytimes.com/2025/01/17/technology/instagram-youtube-tiktok-ban.html; Ali Mogharabi, *Potential TikTok Ban in U.S. Would Benefit Google, Meta, and Snap*, Morningstar (Mar. 17, 2023), https://www.morningstar.com/stocks/potential-tiktok-ban-us-would-benefit-google-meta-snap ("In our view, the uncertainty surrounding the possible ban or sale of TikTok could benefit Snap, Meta's Instagram, and Google's YouTube."); Krystal Scanlon & Tim Peterson, *As TikTok teeters, YouTube, Meta, Snapchat and more race to claim its ad dollars with incentives, discounts*, Digiday (January 17, 2025), https://digiday.com/marketing/as-tiktok-teeters-youtube-meta-snapchat-and-more-race-to-claim-its-ad-dollars-with-incentives-discounts/; Andrew Kessel, *Meta, YouTube, and Others Morgan Stanley Says Could Benefit From TikTok Ban*, Investopedia (Jan. 17, 2025), https://www.investopedia.com/meta-youtube-and-others-morgan-stanley-says-could-benefit-from-tiktok-ban-8776561; Lloyd Lee, Lara O'Reilly, and Kenneth Niemeyer, *Meta Could Rake in Billions in Ad Dollars if TikTok is Banned*, Business Insider (Jan. 17, 2025), https://www.businessinsider.com/tiktok-us-ban-how-meta-benefits-google-instagram-youtube-ad-2025-1.

56.    The analysts were correct: Alphabet's stock rose when the TikTok Law was signed, and when its legality was affirmed by the Supreme Court. Alphabet's stock rose from $159.92 on April 23, 2024 to $161.10 on April 24, 2024, the day the TikTok bill was signed. Similarly, its stock rose from $194.41 on January 16, 2025 to $197.55 on January 17, 2025, the day the Supreme Court affirmed the constitutionality of the bill.

57.    Conversely, Alphabet's stock fell when the President announced the "framework" for a sale, and again when TikTok U.S. confirmed that the sale had been finalized. Alphabet's stock fell from $247.83 on September 24, 2025 to $246.57 on September 25, 2025, the day the framework was announced. It fell again from $330.84 on January 22, 2026 to $328.43 on January 23, 2026 (TikTok U.S.'s website lists its announcement as being released on January 22, 2026, but the actual news of the deal did not break until January 23).

58.    The story was the same with Meta, whose stock rose the more likely it appeared that the TikTok Law would be enforced, and fell as it appeared the law would not be enforced. For instance, Meta's stock rose from $611.30 January 16, 2025 to $612.77 on January 17, 2025, the day the Supreme Court affirmed the constitutionality of the bill. Conversely, Meta's stock fell from

23

$760.66 on September 24, 2025 to $748.91 on September 25, 2025,

the day the framework was announced.

59.    As a result, Petitioners—investors in Alphabet and

Meta—have suffered financially.

60.    Respondents' actions subvert the purpose of the TikTok

Law. As discussed, the statute was motivated by a desire to prevent

the Chinese government from pushing propaganda onto, and taking

sensitive data from, American users. But under the current deal,

ByteDance, which is allied with the Chinese government, continues

to own TikTok's recommendation algorithm. It can therefore promote

the speech it favors, suppress the speech it disfavors, and collect data

on users, exactly as Congress feared.

## GROUNDS ON WHICH RELIEF IS SOUGHT

### GROUND ONE
### (against all Respondents)
### Ultra Vires Action

61.    Petitioners incorporate the allegations in the preceding

paragraphs as though fully set forth herein.

62.    The President's repeated unlawful delays in the

implementation of the TikTok law, and his ultimate approval of the

final deal to his allies are ultra vires, because the President violated

an act of Congress in granting numerous extensions to the law,

directed the Attorney General not to enforce the law, and deemed a deal that facially violated the statute a "qualified divestiture."

63.    Specifically, the TikTok law allowed a "1-time," 90-day extension of the implementation deadline of the TikTok law if the President certified to Congress that:

    a.  A "path to executing the qualified divestiture has been identified;"

    b.  Evidence of "significant progress" towards such a divestiture has been produced; and

    c.  "[T]here are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension." TikTok Law at § 2(a)(3).

64.    The President granted five extensions: on January 20, 2025, April 4, 2025, June 19, 2025, September 16, 2025, and September 25, 2025. In none of these extensions did the President make the necessary certifications, and all but the first extension were specifically prohibited by law.

65.    Additionally, the TikTok law has a rare imperative that the Attorney General "shall" investigate any violation of the law. She has not. Moreover, in his five extensions, the President specifically

commanded the Attorney General not to enforce the law, contrary to the statute.

66.    Finally, the President declared that the sale of TikTok's U.S. assets to a consortium of investors, "once its implementation agreements are executed" would be a "qualified divestiture." Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). By TikTok U.S.'s own description of the sale, however, the deal violated the law and was not a qualified divestiture. Specifically, the law required that ByteDance have no "operational relationship" with the parent company. But according to TikTok U.S.'s own announcement, ByteDance continues to have an operational relationship in at least the following ways:

> a.  ByteDance continues to own the recommendation algorithm, and TikTok U.S. simply licenses it;
>
> b.  ByteDance continues to have control over the company's interoperability, e-commerce, advertising, and marketing operations; and
>
> c.  A ByteDance executive continues to serve as a director of TikTok U.S.

67.    All of these constitute a continuing "operational relationship" between ByteDance and TikTok.

68.    Pursuant to 28 U.S.C. §§ 2201-2202, Petitioners are entitled to a declaration that the following actions are ultra vires and contrary to law:

   a.  The President repeatedly granted extensions in violation of the direction to allow just one 90-day extension and, even then, only when the President made certain certifications to Congress.

   b.  The President repeatedly directed the Attorney General not to enforce the law.

   c.  The Attorney General, in fact, did not enforce the law.

   d.  The sale that the President purported to approve on January 22, 2026, was, contrary to the President's assertions otherwise, not a "qualified divestiture" under the law.

69.    This declaration will remove an illegal impediment, imposed by the government, to Petitioners' financial recovery.

## GROUND TWO
### (against the Attorney General)
### Violation of the Administrative Procedure Act

70.    Petitioners incorporate the allegations in the preceding paragraphs as though fully set forth herein.

71.     The TikTok law directs that the Attorney General "shall conduct investigations" into violations of the statute. This is an unusual phrasing in the law, which typically affords the Attorney General discretion on whether and how to enforce statutes. Here, the Attorney General was granted no such discretion, and failed to follow the directive of the law by refusing to investigate the deal approved by the President, which was facially illegal.

72.     The Department of Justice is an "agency" under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551(1), 701(b)(1).

73.     The Attorney General's failure to investigate violations of the TikTok law as required is a final agency action, as it marks the consummation of the agency's decision-making process and is an action from which legal consequences flow. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

74.     Under the APA, a reviewing court must set aside a challenged agency action that is found to be, among other possibilities, "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

75.     Because the Attorney General failed to conduct an investigation into violations of the TikTok as required by statute, the

Department of Justice has acted contrary to law and in excess of its authority. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

76.    Petitioners requests that this Court:

a.   Declare that the Attorney General's failure to investigate violations of the TikTok Law was contrary to statute; and

b.   Direct the Attorney General to conduct an investigation as required by law.

77.    This declaration, and this direction, will remove an illegal impediment, imposed by the government, to Petitioners' financial recovery.

## GROUND THREE
### (against all Respondents)
### Equitable Claim for Violations of Federal Law by Federal Officials

78.    Federal courts also possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

79.    The President and Attorney General are federal officials.

80.    By granting unlawful extensions in applying the TikTok law, failing to investigate violations of the law, and ultimately approving a deal that facially violated the law, Respondents have violated the law in a manner in which equitable relief is appropriate.

29

81.    Petitioners request that this Court declare the President and Attorney General's actions, as described above, contrary to law, and direct the Attorney General to investigate violations of the TikTok law as required by statute.

## REQUESTED RELIEF

Petitioners respectfully request that the Court provide the following relief:

1. Declare that the extensions, failure to investigate, and approval of the illegal TikTok sale are contrary to law.

2. Direct the Attorney General to conduct investigations into violations of the law, as required by statute.

3. Award attorneys' fees and costs.

4. Award any such other relief as in law or equity may pertain.


Respectfully submitted,


/s/ Brendan Ballou
Brendan Ballou
Public Integrity Project
D.C. Bar No. 241592
brendan@publicintegrityproject.com
(917) 684-3900
*Counsel for Petitioners Zhaocheng
Anthony Tan and Garrett Reid*

# Appendix A

PUBLIC LAW 118–50—APR. 24, 2024        138 STAT. 955

Fusion Development Strategy programs of the People's Republic of China, including the following:

(1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China. Summary.

(2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

(3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

(A) Whether the entity has procured components from any known United States suppliers.

(B) Whether any United States technology imported by the entity is controlled under United States regulations.

(C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

(D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs of the House of Representatives;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Relations of the Senate; and

(4) the Committee on Armed Services of the Senate.

# DIVISION H—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

Protecting Americans from Foreign Adversary Controlled Applications Act.

### SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act". 15 USC 9901 note.

### SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.

15 USC 9901 note.

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

*Effective dates.* (2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

*President. Determination.* (B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

*President. Certification.* (3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

*Applicability.* (b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

PUBLIC LAW 118–50—APR. 24, 2024    138 STAT. 957

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

*Investigations.*

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

*Courts.*

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

PUBLIC LAW 118–50—APR. 24, 2024          138 STAT. 959

 (ii) TikTok;

 (iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

 (iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

 (i) is controlled by a foreign adversary; and

 (ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of— <span style="float:right">Determination. President.</span>

  (I) a public notice proposing such determination; and <span style="float:right">Notice.</span>

  (II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture. <span style="float:right">Reports.</span>

 (4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

 (5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

 (6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that— <span style="float:right">President. Determinations.</span>

 (A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

 (B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

 (7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

 (8) UNITED STATES.—The term "United States" includes the territories of the United States.

## SEC. 3. JUDICIAL REVIEW. <span style="float:right">15 USC 9901 note.</span>

 (a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division

138 STAT. 960            PUBLIC LAW 118–50—APR. 24, 2024

may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

Deadlines.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this division; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.

Protecting Americans' Data from Foreign Adversaries Act of 2024.

# DIVISION I—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

15 USC 9901 note.

**SEC. 1. SHORT TITLE.**

This division may be cited as the "Protecting Americans' Data from Foreign Adversaries Act of 2024".

15 USC 9901.

**SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.**

(a) PROHIBITION.—It shall be unlawful for a data broker to sell, license, rent, trade, transfer, release, disclose, provide access to, or otherwise make available personally identifiable sensitive data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation of this section shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this section in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who violates this section shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may be construed to limit the authority of the Commission under any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Federal Trade Commission.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ZHAOCHENG ANTHONY TAN, and

GARRETT REID,

        Petitioners,

    v.

DONALD TRUMP, in his official capacity as President of the United States, and

PAM BONDI, in her official capacity as Attorney General,

        Respondents.

Case No. _____26-1047_____

I hereby certify that on March 5, 2026, I caused the foregoing

Petition for Review to be served upon the following recipients:

By certified mail:
Donald J. Trump
President of the United States
1600 Pennsylvania Avenue, NW
Washington, DC 20500

By certified mail:
Pam Bondi
Attorney General of the United States
U.S. Department of Justice

950 Pennsylvania Avenue, NW
Washington, DC 20530

By certified mail and email:
Jeanine Pirro
United States Attorney
601 D Street, NW
Washington, DC 20579

Respectfully submitted,


/s/ Brendan Ballou
Brendan Ballou
Public Integrity Project
D.C. Bar No. 241592
brendan@publicintegrityproject.com
(917) 684-3900

*Counsel for Petitioners Zhaocheng
Anthony Tan and
Garrett Reid*