## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ZHAOCHENG ANTHONY TAN,

GARRETT REID, and

JOHN DOE,

　　　　*Petitioners*,

　　　v.

DONALD TRUMP, in his official capacity as President of the United States, and

TODD BLANCHE, in his official capacity as Acting Attorney General,

　　　　*Respondents.*

Case No. 26-1047

## AMENDED PETITION FOR REVIEW OF LEGALITY OF ACTIONS ARISING UNDER THE PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

## I.    Introduction

1.    TikTok is an enormously popular social media app. About 170 million Americans, and nearly a quarter of the entire world population, use it every month. TikTok was created by a Chinese company, ByteDance, Ltd., and in recent years, politicians have expressed concern that the ubiquitous app could serve as a platform for spreading Chinese government propaganda inside the United States. In 2024, Congress passed, and the President signed, a law prohibiting TikTok's distribution in the United States unless ByteDance severed itself from the app's domestic operations. Protecting Americans From Foreign Adversary Controlled Applications Act, H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024) (the "TikTok Law"). Under the law, TikTok had until January 19, 2025 to find a new corporate home, or face hundreds of billions of dollars in fines.

2.    The law was clear, but it was never enforced. Shortly after the deadline to divest passed, President Trump issued an executive order purportedly granting an extension for TikTok to find a domestic owner, and directed his Attorney General not to enforce the law. In the subsequent months, President Trump issued four more extensions, all contrary to the plain text of the law, and all directing

the Attorney General (also contrary to the statute) to conduct no investigation into the law's violation.

3.    On January 22, 2026—more than a year after the deadline set by law—a new joint venture announced that a deal had been reached for TikTok's domestic operations. Under the deal, TikTok's American assets would be acquired by companies including Oracle, MGX, Susquehanna International Group, and General Atlantic, each of which, directly or through their leaders, contributed millions to the President's political projects or invested billions in his personal businesses. They have proven inept managers of the app, with users experiencing new and major problems since the acquisition.

4.    These companies acquired TikTok at a price so low that one analyst called the deal "daylight robbery." Moreover, the President rejected a competing offer to buy TikTok for $6 billion more than the price offered by the winning consortium. The difference: the competing bidders had not, as the winners had, enriched the President.

5.    This deal, like the many extensions that preceded it, facially violated the law. Under the statute, ByteDance cannot have an ongoing "operational relationship" with TikTok's severed

American operations. But in fact, under the announced deal, ByteDance would continue to own the app's essential recommendation algorithm, and would license it to the new American TikTok entity. ByteDance would continue to operate the new American TikTok entity's e-commerce, marketing, and advertising operations. And the CEO of TikTok's global operations, which is still owned by ByteDance, would even sit on the new American entity's board.

6. In practice, TikTok's American and global entities continue to be intimately entwined, sharing software systems, machine learning and AI models, and personnel, including legal and human resources staff. ByteDance's employees continue to demand—and receive—access to aggregated American user data. And both ByteDance and the new American entity jointly launch new product features, such as a recent change to track users' specific GPS locations. In fact, in the Apple and Google app stores in the United States, the TikTok app continues to be published by ByteDance, not the new American entity.

7. In short, under the announced deal, ByteDance still controls all the essential elements of TikTok, and continues to access American users' data. Such a deal subverts the very purpose of the

TikTok Law, as ByteDance can continue to push Chinese propaganda, censor the content it does not like, and extract American user data it desires. These were exactly the harms that the TikTok Law was intended to prevent.

8.    The relentless violation of the TikTok Law has harmed Petitioners Zhaocheng Anthony Tan and Garrett Reid, who have invested in companies that compete with TikTok's American operations. When the illegal sale was announced, they suffered financially. By sanctioning an unlawful deal, the government created a legal impediment to Tan and Reid's financial recovery.

9.    Respondents' violation of the law has also harmed Petitioner Reid specifically, a TikTok user for several years. Reid's personal data—including his name, contact information, and viewing history—can be accessed by ByteDance and in turn, by the Chinese government. This was one of the fears that motivated the passage of the TikTok law. Moreover, Respondents orchestrated a deal, not with the highest or most qualified bidders, but with people and companies who enriched the President and his affiliated entities. The TikTok app has experienced numerous serious, and well-reported, failures as a result.

10.    Respondents' continuing violation of the law has also harmed Petitioner John Doe, a former employee of ByteDance. Doe holds restricted stock units in his former employer. Those restricted stock units are worth far less than they otherwise would be because Respondents directed the sale of ByteDance's greatest asset—TikTok—at cut-rate prices to companies that have since mismanaged the app. Moreover, because Respondents directed only a sham separation between the companies, Doe's job was terminated, as his unique U.S.-based role was deemed redundant. Accordingly, Doe has suffered direct financial and professional harm as a result of this illegal deal.

11.    Because of the harms Petitioners have suffered, they seek to have the government follow the law, rescind its endorsement of an illegal deal, and investigate violations of the law as required by statute.

12.    For the law to mean something, it must be followed, even—perhaps especially—by the President. Respondents have violated the statute and subverted the will of Congress. Petitioners bring this case to ensure that such violations, and such subversion, do not continue.

5

## II.    The Parties

13.    Petitioner Zhaocheng Anthony Tan is a software engineer and resident of California. He is a shareholder in Alphabet Inc.

14.    Petitioner Garrett Reid is a software engineer and resident of California. He is a shareholder in Meta Platforms, Inc.

15.    Petitioner John Doe is a former employee of one of the U.S.-based entities of ByteDance. He is a resident of the United States. He brings this case pseudonymously because he is a first-generation Chinese American, with immediate family still living in China. He fears harassment, persecution, or retaliation against his himself and his family members still in China if his identity is revealed to ByteDance, to the Chinese government, or to third parties affiliated with the government.

16.    Respondent Donald J. Trump is the President of the United States, and is sued in his official capacity. As President, Trump granted unlawful extensions for companies to comply with the law requiring TikTok's divestiture, and ultimately directed the sale of TikTok's American assets in a deal that violated the statute.

17.    Respondent Todd Blanche is Acting Attorney General, and is sued in his official capacity. Acting Attorney General Blanche and

his predecessor, Pam Bondi, failed to investigate violations of the TikTok Law, as was required by statute.

## III.  Jurisdiction

18.    This Court has original jurisdiction over challenges, such as this Petition, to any action, finding, or determination under the TikTok Law. TikTok Law §§ 3(a), (b). This Court has further jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202.

## IV.  Facts

### a. Background

19.    TikTok is a social media app through which users make and watch short videos. TikTok is powered by a "proprietary algorithm that recommends videos to a user based on the user's interactions with the platform." *TikTok Inc. v. Garland*, 604 U.S. 56, 63 (2025). "Each interaction a user has on TikTok—watching a video, following an account, leaving a comment—enables the recommendation system to further tailor a personalized content feed." *Id.*

20.    This recommendation algorithm—the tool by which TikTok pushes content that it believes will most appeal to each user—is notoriously effective: one journalist gushed that the app

"Reads Your Mind." As a result, TikTok has about 1.9 billion users globally (about a quarter of the entire world population), and 170 million users here in the United States.

21.    TikTok was created by ByteDance, a Chinese company, and American politicians and national security officials have increasingly voiced their concerns that TikTok could be used to access Americans' sensitive data and push Chinese government propaganda onto American users.

22.    This is not a speculative risk. As the Supreme Court subsequently explained, "China has engaged in extensive and years-long efforts to accumulate structured datasets, in particular on U. S. persons, to support its intelligence and counterintelligence operations." *TikTok*, 604 U.S. at 75 (internal quotation marks omitted).

23.    Willingly or not, ByteDance can be roped into this effort, as it "is subject to Chinese laws that require it to assist or cooperate with the Chinese Government's intelligence work and to ensure that the Chinese Government has the power to access and control private data' the company holds." *Id.* at 63–64. (internal quotation marks omitted). As a result, "TikTok would try to comply if the [Chinese Government] asked for specific actions to be taken to manipulate

content for censorship, propaganda, or other malign purposes in the United States." *TikTok Inc. v. Garland*, 122 F.4th 930, 960–61 (D.C. Cir. 2025) (internal quotations omitted).

24.    Facing these concerns, bipartisan coalitions of members of Congress began introducing bills to ban Chinese ownership of TikTok's U.S. operations, culminating in the "Protecting Americans from Foreign Adversary Controlled Applications Act." The law prohibits U.S. companies from hosting TikTok's services, or from offering TikTok in their app stores, unless TikTok's U.S. operations are severed from its Chinese parent. Rolled into a larger defense spending package, the bill passed with bipartisan support, and was signed by President Biden on April 24, 2024. H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50 (Apr. 24, 2024).

25.    ByteDance challenged the law, alleging that the statute violated, among other things, the First and Fourteenth Amendments. This Court upheld the law, and the Supreme Court affirmed. *TikTok Inc. v. Garland*, 122 F.4th 930 (D.C. Cir.), *aff'd*, 604 U.S. 56 (2025). As the Supreme Court explained, "The Act's prohibitions and divestiture requirement are designed to prevent China—a designated foreign adversary—from leveraging its control over ByteDance Ltd.

to capture the personal data of U. S. TikTok users." *TikTok*, <u>604 U.S. at 74</u> (2025). It added:

> The prohibitions [of the TikTok Law] account for the fact that, absent a qualified divestiture, TikTok's very operation in the United States implicates the Government's data collection concerns, while the requirements that make a divestiture 'qualified' ensure that those concerns are addressed before TikTok resumes U. S. operations. Neither the prohibitions nor the divestiture requirement, moreover, is substantially broader than necessary to achieve this national security objective. Rather than ban TikTok outright, the Act imposes a conditional ban. The prohibitions prevent China from gathering data from U. S. TikTok users unless and until a qualified divestiture severs China's control.

*TikTok*, <u>604 U.S. at 77</u>.

26.    Collectively, Congress passed, the President signed, and the Supreme Court affirmed the legality of the statute. Companies, all three branches of the federal government directed, must comply with the requirements of the TikTok Law.

### b. The Requirements of the TikTok Law

27.    As relevant here, the TikTok Law requires three things.

28.    **Divestiture requirement.** The TikTok Law prohibits distributing, maintaining, or updating within the United States any "foreign adversary controlled application," which includes any website or application controlled by ByteDance, Ltd. TikTok Law at §§ 2(a)(1), 2(g)(3).

29. This prohibition does not apply, however, when there is a "qualified divestiture" of the application. *Id.* at § 2(c)(1). For a divestiture to qualify, the President must determine that the application is no longer controlled by a foreign adversary, and that there is no "operational relationship" between the severed application and any formerly affiliated entities controlled by a foreign adversary. *Id.* at § 2(g)(6). An operational relationship includes, but is not limited to, "any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." *Id.*

30. **Time requirement.** As written, the TikTok Law's prohibitions go into effect 270 days after the enactment of the law, *Id.* at § 2(a)(2)(A). The President may grant a "1-time extension" of "not more than 90 days" if the President certifies to Congress that:

    a. A "path to executing the qualified divestiture has been identified;"

    b. Evidence of "significant progress" towards such a divestiture has been produced; and

    c. "[T]here are in place the relevant binding legal agreements to enable execution of such qualified

divestiture during the period of such extension."

*Id.* § 2(a)(3).

31.    In sum, the President may extend the TikTok law's statutory deadline, just once, and by up to 90 days, only if he certifies to Congress that, among other things, there are already binding legal agreements to execute the qualified divestiture.

32.    **Enforcement requirement.** Entities that distribute, maintain, or update covered applications are subject to a civil penalty of up to $5,000 for each user of the applications in the United States. *Id.* at § 2(d)(1)(A). For TikTok, with 170 million domestic users, this would come to $850 billion in civil penalties. Unusual for statutory language, the law directs that the Attorney General "shall" conduct investigations related to potential violations of the law, and if she determines that a violation has occurred, "shall" pursue enforcement of the law. *Id.* at § 2(d)(2)(A). Conversely, in the next paragraph the law permits that the Attorney General "may" bring an action in federal court for appropriate relief, emphasizing that the "shall" language is, indeed, a directive to the Attorney General to act. *Id.* at § 2(d)(2)(B).

## V.    The President Repeatedly Violates the TikTok Law

33.    The TikTok law was signed by President Biden on April 24, 2024, putting the divestiture deadline at January 19, 2025. Given that the deadline was one day before the presidential inauguration, a Biden administration official said that the President would defer on any extension decision to President-elect Trump.

34.    ByteDance did not divest its U.S. operations, and so on January 18, 2025, TikTok made its services temporarily unavailable in the United States, and TikTok was removed from Apple and Google's app stores. A few hours later, President-elect Trump announced that he would grant an extension for the divestiture, and TikTok's services were quickly restored.

35.    On January 20, 2025, President Trump issued an executive order purportedly granting a 75-day extension to the divestiture requirement. Exec. Order No. 14166, Application Of Protecting Americans From Foreign Adversary Controlled Applications Act To TikTok, 90 Fed. Reg. 8611 (Jan. 20, 2025). Contrary to the requirements of the law, however, the President did not in his executive order certify to Congress any of the necessary findings for granting an extension. Specifically, he did not certify that a path to executing a qualified divestiture of TikTok had been

13

identified, that there had been significant progress to executing that divestiture, or that there were binding legal agreements to enable the divestiture during the extension. Additionally, the order directed "the Attorney General not to take any action on behalf of the United States to enforce the" TikTok law, contradicting the direction of the law itself. *Id.*

36.    On April 4, 2025, five days before his first extension was set to expire, President Trump issued a second executive order purportedly granting another 75-day extension. Exec. Order No. 14258, Extending the TikTok Enforcement Delay, 90 Fed. Reg. 15209 (Apr. 4, 2025). Notably, the TikTok law allowed only a "1-time" extension of 90 days. This was a second extension, together totaling 150 days, facially violating the requirements of the law.

37.    As with the first order, President Trump failed to make the necessary certifications to Congress that a divestiture deal was forthcoming. And as with the first order, the President directed the Attorney General specifically to not enforce the law, announcing that "the Department of Justice shall take no action to enforce the [TikTok Law] or impose any penalties against any entity for any noncompliance with the Act." *Id.* In fact, the Order directed that "even after the expiration of the above-specified period, the

14

Department of Justice shall not take any action to enforce the Act." *Id.* In other words, the President indefinitely directed that the law not be enforced.

38. On June 19, 2025, President Trump issued a third extension, this time for 90 days (240 days total). Exec. Order No. 14310, Further Extending the TikTok Enforcement Delay, 90 Fed. Reg. 26913 (June 19, 2025). Again, President Trump did not make any of the certifications as required by the law. And again, the President directed that the Attorney General specifically not enforce the law.

39. On September 16, 2025, President Trump issued a fourth purported extension, again for 90 days (330 days total). Exec. Order No. 14310, Further Extending the TikTok Enforcement Delay, 90 Fed. Reg. 26913 (Sept. 16, 2025). Once again, President Trump did not make any of the certifications as required by the law. Once again, the President directed that the Attorney General specifically not enforce the law.

40. On September 25, 2025, President Trump issued a fifth purported extension, this time for 120 days. Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). Yet again, he failed to make the necessary

15

certifications as required by law, and yet again, he directed the Attorney General not to enforce the law.

41.    In this September Order, President Trump announced a generic "framework" for a sale that he said would, once completed, constitute a "qualified divestiture" under the TikTok Law. *Id.* The "framework" did not say, however, what assets would be sold, or even who would buy them (the buyers were not announced).

42.    The President conceded that this announced framework by itself did not constitute a "qualified divestiture." Instead, he determined "that the divestiture of the applications outlined in the Framework Agreement, *once its implementation agreements are executed*, is a 'qualified divestiture' under the [TikTok law]." *Id.* (emphasis added). In other words, the President acknowledged that a qualified divestiture had not yet occurred, nearly a year after the deadline for approving one had passed.

43.    On January 22, 2026, a new legal entity, TikTok USDS Joint Venture LLC ("TikTok U.S."), announced that a deal to sell the company's domestic assets had finally been reached, more than a year after the statutory deadline for doing so had passed. In its announcement, TikTok U.S. explained that ByteDance would continue to own 19.9% of the company, while three primary

16

investors—Oracle, MGX, and Silver Lake—would each hold 15% of the company. A range of other investors, including affiliates of Susquehanna International Group, LLP, General Atlantic, and Dell Technologies founder Michael Dell, rounded out the ownership group.

44.    On Truth Social that day, President Trump announced that he had directed the sale of TikTok's American assets, saying that "I am so happy to have helped in saving TikTok! It will now be owned by a group of Great American Patriots and Investors, the Biggest in the World, and will be an important Voice." Donald Trump (@realDonaldTrump), Truth Social (Jan 22, 2026, 9:52 PM), https://truthsocial.com/@realDonaldTrump/posts/115942147803684675. Emphasizing that this deal concluded the government's review, he thanked members of his administration who "helped bring this Deal to a very dramatic, final, and beautiful conclusion," as well as "President Xi, of China, for working with us and, ultimately, approving the Deal." *Id.* Consistent with his September Executive Order, this deal now, according to the President, purportedly constituted a qualified divestiture under the TikTok Law.

### a. The Deal The President Directed Violates The TikTok Law

45.    The deal that the President directed on January 22, 2026 facially violated the TikTok Law.

46.    *First*, under the deal, TikTok U.S. would not own the app's recommendation algorithm. Rather, ByteDance would continue to own the algorithm, which it would license to TikTok U.S. In turn, TikTok U.S. would simply "retrain, test, and update" the algorithm on user data stored in the United States. *Announcement from the new TikTok USDS Joint Venture LLC*, TikTok USDS Joint Venture LLC (Jan. 22, 2026), https://newsroom.tiktok.com/announcement-from-the-new-tiktok-usds-joint-venture-llc; *see also* David McCabe and Emmett Lindner, *TikTok Strikes Deal for New U.S. Entity, Ending Long Legal Saga*, N.Y. Times (Jan. 23, 2023), https://www.nytimes.com/2026/01/22/technology/tiktok-deal-oracle-bytedance-china-us.html ("In addition to its stake, ByteDance will keep TikTok's coveted algorithm, which it will license to the new U.S. entity."). This violated the TikTok Law's direction that the U.S. entity not have any "operational relationship" with its formerly affiliated entities, "including any cooperation with respect to the

18

operation of a content recommendation algorithm or an agreement with respect to data sharing." TikTok Law at § 2(g)(6).

47.    *Second*, TikTok U.S. announced that existing ByteDance subsidiaries based in the United States—not TikTok U.S. itself— "will manage global product interoperability and certain commercial activities, including e-commerce, advertising, and marketing." *Announcement from the new TikTok USDS Joint Venture LLC*, TikTok USDS Joint Venture LLC (Jan. 22, 2026), https://newsroom.tiktok.com/announcement-from-the-new-tiktok-usds-joint-venture-llc. This meant that ByteDance, not TikTok U.S., would be responsible for the latter company's interoperability and various crucial commercial operations. ByteDance's continuing operation of TikTok U.S.'s interoperations, e-commerce operations, advertising operations, and marketing operations constitute an ongoing "operational relationship" prohibited under the law.

48.    *Third*, TikTok U.S.'s board would include Shou Chew, who is the CEO and a director of ByteDance's global TikTok subsidiary. As a board member, Chew can help choose senior personnel for TikTok U.S. and their compensation; approve proposed budgets, mergers, and dividends; oversee the company's legal and compliance operations; and select the company's strategic direction. Because a

ByteDance executive would direct TikTok U.S. on its board, this constitutes yet another "operational relationship" prohibited by the law.

49.    In addition to violating the law, the deal that President Trump directed on January 22, 2026 was materially and obviously different than the "framework" he endorsed the previous September.

50.    *First*, in September, the President announced that "This new joint venture will be run by a new board of directors." Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). This is false. Shou Chew is the CEO and director of ByteDance's continuing TikTok operations, yet also serves as a director on the board of TikTok U.S.

51.    *Second*, in September, the President announced that "the divestiture puts the operation of the algorithms and code, as well as content-moderation decisions, under the control of the new joint venture." *Id.* This too is false. ByteDance continues to own and operate the recommendation algorithm for TikTok U.S.

52.    *Third*, in September, the President announced that that the divestiture "precludes any 'operational relationship' between a formerly affiliated entity controlled by a foreign adversary and the new joint venture." *Id.* This is false for the reasons discussed above.

20

Not only will ByteDance continue to own and license the underlying algorithm, it will also continue to operate the domestic company's interoperations, e-commerce, marketing, and advertising operations.

53. The TikTok Law further directed that the Attorney General "shall conduct investigations related to potential violations." TikTok Law § 2(d)(2). But despite the fact that the deal the President directed on January 22, 2026 facially violated the law, the Attorney General conducted no announced investigation into the deal as a potential violation, as was required by the statute. This failure to investigate remains an ongoing violation of the law.

### b. TikTok U.S. Retains An Operational Relationship With ByteDance

54. Respondents permitted TikTok U.S. to have an operational relationship with ByteDance, in facial violation of the law. Unsurprisingly, the companies, in fact, continue to have such an operational relationship.

55. **Staffing and infrastructure:** TikTok U.S. has little ability to—and as described below, does not—run its own TikTok app, its machine learning or AI efforts, or even its own operations. TikTok U.S. has insufficiently many engineers working for it, and so by necessity relies on ByteDance staff to maintain and develop the

TikTok app. TikTok admitted as much to this Court when it wrote that:

> Precipitously moving all TikTok source code development from ByteDance to a new TikTok owner would be impossible as a technological matter. . . . Specifically, to comply with the law's divestiture requirement, that code base would have to be moved to a large, alternative team of engineers — a team that does not exist and would have no understanding of the complex code necessary to run the platform. It would take years for an entirely new set of engineers to gain sufficient familiarity with the source code to perform the ongoing, necessary maintenance and development activities for the platform.

Petition, *TikTok Inc. et al. v. Garland*, Doc. No. 2055084 (D.C. Cir. May 17, 2024).

56.    But more than engineers, TikTok U.S. uses ByteDance's legal, human resources, privacy, audit, and export control staff too. It relies on the ByteDance employees who manage that company's relationship with Apple and Google and the "app stores" that are so crucial to TikTok's survival. And TikTok U.S. even relies on ByteDance's internal software for its own operations, such as for work collaboration, expense submission and approval, human resources management, and restricted stock unit management. ByteDance previously admitted that such sharing of software infrastructure violated the TikTok Law. *Id.* ("Moreover, to keep the

22

platform functioning, these engineers [at TikTok U.S.] would need access to ByteDance software tools, which the Act prohibits.")

57.    **Data access:** TikTok U.S. does have its own team of data scientists, but they are largely new and inexperienced. They must therefore work with ByteDance staff, including those in China, to develop queries to conduct searches on American user data. The data pulled by those queries are often sent back to ByteDance staff, for testing and debugging product features. As a result, ByteDance staff continue to have aggregated access to American user data for advertising and e-commerce operations, among other purposes. This runs directly contrary to the TikTok Law, which was "designed to prevent China—a designated foreign adversary—from leveraging its control over ByteDance Ltd. to capture the personal data of U. S. TikTok users." *TikTok*, 604 U.S. at 74 (2025).

58.    **Product management:** ByteDance and TikTok U.S. jointly share responsibility for approving new products and features. Since January 2026, one of the features that the two companies jointly approved was the ability for the TikTok app to collect data on users' precise locations using GPS technology. The TikTok app had previously collected this data, but ByteDance was widely criticized after its employees used this feature to track down journalists who

23

covered the company critically. *See* Clare Duffy, *TikTok confirms that journalists' data was accessed by employees of its parent company*, CNN (Dec. 22, 2022), https://www.cnn.com/2022/12/22/tech/tiktok-bytedance-journalist-data. After this scandal, the feature was discontinued. But shortly after Respondents directed the sale of TikTok U.S., ByteDance and TikTok U.S. jointly approved and reinstated this feature. *See* Reece Rogers, *TikTok Is Now Collecting Even More Data About Its Users. Here Are the 3 Biggest Changes*, Wired (Jan. 23, 2026), https://www.wired.com/story/tiktok-new-privacy-policy/.

59.    **Shared App:** Stunningly, TikTok U.S. and ByteDance actually have the same app. Both the Apple App Store and the Google Play Store publicly list "TikTok Pte. Ltd." as the publisher of the TikTok app available to American users. This company is a subsidiary of ByteDance, not TikTok U.S. Neither Apple nor Google list TikTok USDS Joint Venture LLC—that is to say, TikTok U.S.—as the publisher of the TikTok app.

60.    Further technical investigation validates this conclusion. The unique identification number for the TikTok app in the Apple app store—the number that confirms whether an app is the same of different across countries—is the same in the United States as it is

24

for many other countries, including Russia, Iraq, Serbia, and Pakistan. That is to say, the app that TikTok U.S. is supposed to uniquely control is, in fact, the same as the app used by ByteDance in many other countries.

61.    Various TikTok-related apps produced by ByteDance also share the same publishers. TikTok Studio (which offers TikTok creators analytics on their content), TikTok Shop Seller Center (which allows users to sell products on TikTok), and PineDrama (which produces short written dramas) all list TikTok Pte. Ltd., not TikTok U.S., as their publisher. CapCut (a video editor) and Hypic (a photo editor) both list ByteDance Pte. Ltd., not TikTok U.S., as their publisher.

62.    The upshot is that there is no separate app for TikTok users in the United States. When it comes to the product that matters, ByteDance and TikTok U.S. are not just entwined: they are the same.

### c. The Deal The President Directed Rewarded Allies Who Personally Enriched Him

63.    As discussed, the deal Respondents directed on January 22, 2026 include Oracle, MGX, and affiliates of Susquehanna International Group, LLP and General Atlantic, among other

companies. These firms or their leaders have close ties to the President, and have at times personally enriched him.

64.    **Oracle.** Oracle co-founder and chairman Larry Ellison previously hosted a $100,000-per-person fundraiser for Trump at Ellison's estate. He and his son David purchased CBS News, which the elder Ellison has assured President Trump he would make a more conservative outlet. And with financial backing from his father, David Ellison is now trying to buy Warner Bros. Discovery, an acquisition requiring approval from the Trump administration. Larry Ellison similarly discussed firing anchors at CNN (owned by Warner Bros.) whom the President dislikes.

65.    **MGX.** MGX, an investment firm backed by the United Arab Emirates' sovereign wealth fund, previously paid for a $2 billion investment in the cryptocurrency company Binance using the Trump family's cryptocurrency, USD1. This massive, highly unusual purchase of a new currency increased USD1's legitimacy, and allowed President Trump's crypto business, World Liberty Financial, to generate interest income on the investment.

66.    **Susquehanna.** Susquehanna's founder Jeff Yass donated $16 million to Trump's Super PAC, MAGA, Inc. Susquehanna itself was the largest shareholder in the company that merged with Donald

Trump's media company, Trump Media & Technology Group. If Yass retained his stake in the merged company (it has not been disclosed), his firm is one of the largest institutional shareholders in Trump Media.

67.  **General Atlantic.** William Ford, the CEO of General Atlantic, gave $1.25 million to Trump's primary political action committee, MAGA, Inc.

68.  In turn, President Trump's direction of the TikTok sale has enriched these companies and executives. These firms bought TikTok for just $14 billion. ByteDance itself is worth $300 billion, and analysts valued the sale of TikTok's U.S. operations at $40-$50 billion. At just $14 billion, TikTok U.S.'s ultimate sale price valued the company at just 1.4 times its annual sales. By comparison, YouTube's value is roughly eight times its annual sales, and Instagram is roughly ten times. One analyst described TikTok's low purchase price as "daylight robbery." *TikTok's $14 billion price tag in Trump deal stuns investors*, Bloomberg (Sept. 26, 2025), https://archive.is/20250926054336/https://www.bloomberg.com/news/articles/2025-09-26/prized-tiktok-business-valued-like-boring-blue-chip-in-us-deal. Another major investor observed that the deal "could be the most undervalued tech acquisition of the decade." John

27

Cassidy, *Donald Trump's TikTok Deal Looks Like Crony Capitalism*, New Yorker (Sept. 29, 2025), https://www.newyorker.com/news/the-financial-page/donald-trumps-tiktok-deal-looks-like-crony-capitalism.

### d. The President Rejected A Better Deal From Bidders Who Had Not Personally Enriched Him

69.    While President Trump directed a deal that rewarded allies who had enriched him, he rejected a better deal from bidders who had not.

70.    Specifically, in late 2024, business executive and philanthropist Frank McCourt assembled a consortium of investors to buy TikTok's U.S. assets. McCourt's proposal, which was called the "People's Bid" for TikTok, proposed to refocus the app away from trying to endlessly grab users' attention and towards more intentional actions, and to give users more control over their own personal data. This was consistent with spirit of the TikTok Law, which aimed to free American users from Chinese propaganda, and to protect American users' data from the Chinese government.

71.    McCourt proposed to buy TikTok's U.S. assets for $20 billion: $6 billion more than the deal that President Trump ultimately directed. McCourt's team had productive conversations

with the Biden administration about the proposal, and received informal notice that their proposal complied with the TikTok Law.

72. After Donald Trump returned to office, however, the tenor of the conversations changed. President Trump had delegated the initial process for reviewing bids to the Vice President's office. In the early months of the new administration—sometime between February and April 2025—McCourt's team received notice that the Vice President's office would not be considering their bid. While McCourt's team had friendly conversations with ByteDance's bankers about their proposed acquisition, the White House made clear to McCourt's team that ByteDance would not itself be allowed to choose its own buyer. Rather, the Federal government would choose TikTok's new owner.

73. Additionally, McCourt's team was told that the President was running a secret, separate review process to pull in favored parties to assemble his own, preferred consortium. By May 2025, it was clear that the administration would not permit McCourt's team to acquire TikTok U.S.

74. This was despite the fact that McCourt's consortium bid $20 billion for TikTok's assets, which was $6 billion more than that paid by the winning consortium that the President ultimately

29

orchestrated. This was also despite the fact that McCourt's bid was specifically structured to comply with the letter and spirit of the TikTok Law.

75.    As one leader on McCourt's team put it, "We had designed our bid for just about any contingency, except for the government not abiding by the law."

### e.  The TikTok Sale Harmed Petitioners

76.    Petitioners have all been harmed by Respondents' illegal actions.

77.    **Improperly shared data:** Petitioner Reid has a TikTok account since 2024. The TikTok Law was meant to ensure that the data from users like Reid could not be used by ByteDance or, by extension, the Chinese government. This is why the law prohibited any "operational relationship" between ByteDance and TikTok U.S.

78.    But, as described above, Respondents directed a deal that allowed the companies to share a deeply entwined operational relationship, which allowed ByteDance to continue to access American users' data. Unsurprisingly, this is exactly what has happened: aggregated American users' data from TikTok U.S. is frequently shared with ByteDance. As a TikTok user for several years, Petitioner Reid faces the credible threat that his user data,

including his name, contact information, location, and viewing history, was or will be shared with ByteDance.

79.    Moreover, the Chinese government directs that companies like ByteDance share user data with it. *TikTok*, 604 U.S. at 63-64 (ByteDance "is subject to Chinese laws that require it to assist or cooperate with the Chinese Government's intelligence work and to ensure that the Chinese Government has the power to access and control private data the company holds." (internal quotation marks omitted)). Accordingly, Reid faces the credible fear that his information is or will be shared, not only with ByteDance, but with the Chinese government too.

80.    **Degraded user experience.** The President orchestrated the sale of TikTok's American assets to his financial benefactors, not to those who bid the most or would best manage the product. Unsurprisingly, therefore, since the sale, TikTok has been plagued by operational problems. Among other things, users' personalized pages have been flooded with irrelevant foreign content. Nina Raemont, *TikTok reports 'major infrastructure issue' causing app glitches, bugs*, ZDNet (Jan. 26, 2026), https://www.zdnet.com/article/is-tiktok-down-feed-glitchy-broken/ ("One commenter said that their page is showing only videos in Russian, a language they don't speak, and

31

several users responded sharing the same experience."). Others users noted that they could not search for certain topics, or that some videos erroneously appeared to have no viewers.

81.    TikTok U.S. attributed this to an outage at the datacenter of one its new owners, Oracle. Notably, Oracle never previously managed a major social media network. Had Respondents directed the sale of TikTok's American assets to an experienced, or simply competent, owner, such outages likely would never have occurred. Petitioner Reid faces the risk of ongoing malfunctions with the TikTok app.

82.    **Financial harm:** Petitioner Tan is an investor in Alphabet Inc., the parent company of YouTube. Petitioner Reid is an investor in Meta Platforms, Inc., the parent company of Instagram.

83.    YouTube and Instagram compete with TikTok for sharing and viewing videos. For this reason, financial analysts overwhelmingly expected that these companies would benefit from TikTok's ban in the U.S. *See, e.g.*, Andrew Ross Sorkin *et al.*, *Who Stands to Gain from a TikTok Ban*, N.Y. Times (Apr. 24, 2025), https://www.nytimes.com/2024/04/24/business/dealbook/tiktok-ban-bill-bytedance.html ("Who would benefit? The clear answer is Meta and Google."). Mike Isaac, Nico Grant, and Kate Conger, *Instagram*

*and YouTube Prepare to Benefit From a TikTok Ban*, N.Y. Times (Jan. 17, 2025), https://www.nytimes.com/2025/01/17/technology/instagram-youtube-tiktok-ban.html; Ali Mogharabi, *Potential TikTok Ban in U.S. Would Benefit Google, Meta, and Snap*, Morningstar (Mar. 17, 2023), https://www.morningstar.com/stocks/potential-tiktok-ban-us-would-benefit-google-meta-snap ("In our view, the uncertainty surrounding the possible ban or sale of TikTok could benefit Snap, Meta's Instagram, and Google's YouTube."); Krystal Scanlon & Tim Peterson, *As TikTok teeters, YouTube, Meta, Snapchat and more race to claim its ad dollars with incentives, discounts*, Digiday (January 17, 2025), https://digiday.com/marketing/as-tiktok-teeters-youtube-meta-snapchat-and-more-race-to-claim-its-ad-dollars-with-incentives-discounts/; Andrew Kessel, *Meta, YouTube, and Others Morgan Stanley Says Could Benefit From TikTok Ban*, Investopedia (Jan. 17, 2025), https://www.investopedia.com/meta-youtube-and-others-morgan-stanley-says-could-benefit-from-tiktok-ban-8776561; Lloyd Lee, Lara O'Reilly, and Kenneth Niemeyer, *Meta Could Rake in Billions in Ad Dollars if TikTok is Banned*, Business Insider (Jan. 17, 2025), https://www.businessinsider.com/tiktok-us-ban-how-meta-benefits-google-instagram-youtube-ad-2025-1.

33

84. The analysts were correct: Alphabet's stock rose when the TikTok Law was signed, and when its legality was affirmed by the Supreme Court. Alphabet's stock rose from $159.92 on April 23, 2024 to $161.10 on April 24, 2024, the day the TikTok bill was signed. Similarly, its stock rose from $194.41 on January 16, 2025 to $197.55 on January 17, 2025, the day the Supreme Court affirmed the constitutionality of the bill.

85. Conversely, Alphabet's stock fell when the President announced the "framework" for a sale, and again when TikTok U.S. confirmed that the sale had been finalized. Alphabet's stock fell from $247.83 on September 24, 2025 to $246.57 on September 25, 2025, the day the framework was announced. It fell again from $330.84 on January 22, 2026 to $328.43 on January 23, 2026 (TikTok U.S.'s website lists its announcement as being released on January 22, 2026, but the actual news of the deal did not break until January 23).

86. The story was the same with Meta, whose stock rose the more likely it appeared that the TikTok Law would be enforced, and fell as it appeared the law would not be enforced. For instance, Meta's stock rose from $611.30 January 16, 2025 to $612.77 on January 17, 2025, the day the Supreme Court affirmed the constitutionality of the bill. Conversely, Meta's stock fell from

34

$760.66 on September 24, 2025 to $748.91 on September 25, 2025, the day the framework was announced.

87.   As a result, Petitioners Tan and Reid—investors in Alphabet and Meta—have suffered financially.

88.   Petitioner Doe was also harmed by Respondents' directed sale of TikTok U.S. to administration allies. Doe is a former employee of ByteDance. As an employee, he held "restricted stock units" in ByteDance Ltd. By contract, Doe could only sell the restricted stock units back to ByteDance, at a price pegged to the company's current fair value under the IRS rules.

89.   After Respondents directed the sale of TikTok's American operations at fire sale prices, ByteDance's value was far less than it otherwise would have been, because the company had to sell its primary asset for far less than it is worth. As a result, the sale values of Doe's restricted stock units are far lower than if Respondents had directed a legally compliant and fair sale.

90.   Additionally, because Respondent directed the sale to companies that had little, if any, experience managing a large social network app, TikTok's operations in the United States have suffered, as described above. TikTok U.S. has blamed these mistakes on its effort to migrate its data to Oracle data centers. But this only

highlights that Respondents directed the sale of TikTok U.S. to companies like Oracle because of the buyers' political connections, not their operational skills. Because ByteDance's value is entwined with TikTok U.S.'s, Doe's restricted stock in ByteDance are worth less than they would be, had Respondents directed a legally compliant sale.

91. **Professional harm**: Finally, Doe has experienced significant professional harm because Respondents organized an illegal sale.

92. Doe holds multiple advanced degrees from universities in the United States. He has published papers on numerous engineering topics, and has worked for Fortune 500 companies. Doe has given talks in his area of expertise in professional societies and international conferences. In sum, Doe is a highly accomplished professional and recognized expert in his area. Many colleagues within ByteDance also highly value Doe's expertise.

93. Had ByteDance and TikTok U.S. actually severed, Doe would have remained employed. But to maintain the fiction of separation, Doe was placed under the management of a foreign-based boss. This boss knew little of business, product development, and engineering practices in the United States, and did not understand

Doe and his colleagues' work. Doe and several colleagues were laid off. Had ByteDance and TikTok's American operations actually separated, Doe would have continued to work for TikTok's American operations and retained his job.

94. Accordingly, Petitioners Tan, Reid, and Doe all suffered because of Respondents' illegal acts. Reid faces the serious risk that his sensitive personal data has been shared with ByteDance and eventually the Chinese government. Reid faces the prospect of an ongoing degraded user experience with TikTok. Tan, Reid, and Doe all suffered financial losses because of their investments in competitors to ByteDance, or in ByteDance itself. And Doe suffered the loss of his job because Respondents directed a sale that created only the fiction of separation between ByteDance and TikTok U.S.

95. Ultimately, Respondents' actions subvert the very purpose of the TikTok Law. As discussed, the statute was motivated by a desire to prevent the Chinese government from pushing propaganda onto, and taking sensitive data from, American users. But under the current deal, ByteDance, which is allied with the Chinese government, continues to own TikTok's recommendation algorithm, and continues to access Americans' data. It can therefore promote the

speech it favors, suppress the speech it disfavors, and collect data on users, exactly as Congress feared.

## GROUNDS ON WHICH RELIEF IS SOUGHT

### GROUND ONE
#### (against all Respondents)
#### Ultra Vires Action

96.    Petitioners incorporate the allegations in the preceding paragraphs as though fully set forth herein.

97.    The President's repeated unlawful delays in the implementation of the TikTok law, and his ultimate direction of the final deal to his allies are ultra vires, because the President violated an act of Congress in granting numerous extensions to the law, directed the Attorney General not to enforce the law, and deemed a deal that facially violated the statute a "qualified divestiture."

98.    Specifically, the TikTok law allowed a "1-time," 90-day extension of the implementation deadline of the TikTok law if the President certified to Congress that:

   a. A "path to executing the qualified divestiture has been identified;"

   b. Evidence of "significant progress" towards such a divestiture has been produced; and

38

c. "[T]here are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension." TikTok Law at § 2(a)(3).

99. The President granted five extensions: on January 20, 2025, April 4, 2025, June 19, 2025, September 16, 2025, and September 25, 2025. In none of these extensions did the President make the necessary certifications, and all but the first extension were specifically prohibited by law.

100. Additionally, the TikTok law has a rare imperative that the Attorney General "shall" investigate any violation of the law. The Attorney General has not. Moreover, in his five extensions, the President specifically commanded the Attorney General not to enforce the law, contrary to the statute.

101. Finally, the President declared that the sale of TikTok's U.S. assets to a consortium of investors, "once its implementation agreements are executed" would be a "qualified divestiture." Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025). By TikTok U.S.'s own description of the sale, however, the deal violated the law and was not a qualified divestiture. Specifically, the law required that ByteDance have no

"operational relationship" with the parent company. But according to TikTok U.S.'s own announcement, ByteDance continues to have an operational relationship in at least the following ways:

    a. ByteDance continues to own the recommendation algorithm, and TikTok U.S. simply licenses it;

    b. ByteDance continues to have control over the company's interoperability, e-commerce, advertising, and marketing operations; and

    c. A ByteDance executive continues to serve as a director of TikTok U.S.

102. All of these constitute a continuing "operational relationship" between ByteDance and TikTok.

103. Moreover ByteDance and TikTok U.S. have an ongoing operational relationship by sharing staff and software systems, by sharing American user data, and by jointly launching new products and features. Most stunningly, ByteDance and TikTok U.S. share the exact same app that consumers use.

104. Pursuant to 28 U.S.C. §§ 2201-2202, Petitioners are entitled to a declaration that the following actions are ultra vires and contrary to law:

a. The President repeatedly granted extensions in violation of the direction to allow just one 90-day extension and, even then, only when the President made certain certifications to Congress.

b. The President repeatedly directed the Attorney General not to enforce the law.

c. The Attorney General, in fact, did not enforce the law.

d. The sale that the President purported to direct on January 22, 2026, was, contrary to the President's assertions otherwise, not a "qualified divestiture" under the law.

105. This declaration will remove an illegal impediment, imposed by the government, to Petitioners' financial and professional recovery. It will also remove an illegal impediment to the protection of Petitioners' data and user experience.

## GROUND TWO
### (against the Attorney General)
### Violation of the Administrative Procedure Act

106. Petitioners incorporate the allegations in the preceding paragraphs as though fully set forth herein.

107. The TikTok law directs that the Attorney General "shall conduct investigations" into violations of the statute. This is an

unusual phrasing in the law, which typically affords the Attorney General discretion on whether and how to enforce statutes. Here, the Attorney General was granted no such discretion, and failed to follow the directive of the law by refusing to investigate the deal directed by the President, which was facially illegal.

108.  The Department of Justice is an "agency" under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551(1), 701(b)(1).

109.  The Attorney General's failure to investigate violations of the TikTok law as required is a final agency action, as it marks the consummation of the agency's decision-making process and is an action from which legal consequences flow. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

110.  Under the APA, a reviewing court must set aside a challenged agency action that is found to be, among other possibilities, "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

111.  Because the Attorney General failed to conduct an investigation into violations of the TikTok as required by statute, the Department of Justice has acted contrary to law and in excess of its authority. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

112.  Petitioners requests that this Court:

    a.  Declare that the Attorney General's failure to investigate violations of the TikTok Law was contrary to statute; and

    b.  Direct the Attorney General to conduct an investigation as required by law.

113.  This declaration, and this direction, will remove an illegal impediment, imposed by the government, to Petitioners' financial recovery. It will also remove an illegal impediment to the protection of Petitioners' data and user experience.

## GROUND THREE
### (against all Respondents)
### Equitable Claim for Violations of Federal Law by Federal Officials

114.  Federal courts also possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

115.  The President and Attorney General are federal officials.

116.  By granting unlawful extensions in applying the TikTok law, failing to investigate violations of the law, and ultimately directing a deal that facially violated the law, Respondents have violated the law in a manner in which equitable relief is appropriate.

117. Petitioners request that this Court declare the President and Attorney General's actions, as described above, contrary to law, and direct the Attorney General to investigate violations of the TikTok law as required by statute.

## REQUESTED RELIEF

Petitioners respectfully request that the Court provide the following relief:

1. Declare that the extensions, failure to investigate, and direction of the illegal TikTok sale are contrary to law.

2. Direct the Attorney General to conduct investigations into violations of the law, as required by statute.

3. Award attorneys' fees and costs.

4. Award any such other relief as in law or equity may pertain.

Respectfully submitted,

/s/ Brendan Ballou
Brendan Ballou
Public Integrity Project
D.C. Bar No. 241592
brendan@publicintegrityproject.com
(917) 684-3900
*Counsel for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on April 6, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

<u>/s/ Brendan Ballou</u>
Brendan Ballou
Public Integrity Project
D.C. Bar No. 241592
brendan@publicintegrityproject.com
(917) 684-3900
*Counsel for Petitioners*

# Appendix A

PUBLIC LAW 118–50—APR. 24, 2024          138 STAT. 955

Fusion Development Strategy programs of the People's Republic of China, including the following:

    (1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China.

Summary.

    (2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

    (3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

        (A) Whether the entity has procured components from any known United States suppliers.

        (B) Whether any United States technology imported by the entity is controlled under United States regulations.

        (C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

        (D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

    (1) the Committee on Foreign Affairs of the House of Representatives;

    (2) the Committee on Armed Services of the House of Representatives;

    (3) the Committee on Foreign Relations of the Senate; and

    (4) the Committee on Armed Services of the Senate.

# DIVISION H—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

Protecting Americans from Foreign Adversary Controlled Applications Act.

## SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

15 USC 9901 note.

## SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.

15 USC 9901 note.

(a) IN GENERAL.—

    (1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

Effective dates.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

President. Determination.

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

President. Certification.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

Applicability.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

PUBLIC LAW 118–50—APR. 24, 2024    138 STAT. 957

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

*Investigations.*

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

*Courts.*

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term "United States" includes the territories of the United States.

## SEC. 3. JUDICIAL REVIEW.

(a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division

*Margin notes:*
Determination. President.

Notice.

Reports.

President. Determinations.

15 USC 9901 note.

may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

Deadlines.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this division; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.

Protecting Americans' Data from Foreign Adversaries Act of 2024.

# DIVISION I—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

15 USC 9901 note.

## SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans' Data from Foreign Adversaries Act of 2024".

15 USC 9901.

## SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.

(a) PROHIBITION.—It shall be unlawful for a data broker to sell, license, rent, trade, transfer, release, disclose, provide access to, or otherwise make available personally identifiable sensitive data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation of this section shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this section in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who violates this section shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may be construed to limit the authority of the Commission under any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Federal Trade Commission.

# Appendix 2

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ZHAOCHENG ANTHONY TAN,<br><br>GARRETT REID, and<br><br>JOHN DOE,<br><br>    *Petitioners*,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, and<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General,<br><br>    *Respondents*. | Case No. 26-1047 |

## AFFIDAVIT OF JOHN DOE

I, John Doe (proceeding under a pseudonym), declare as follows:

1.    I am a former employee of ByteDance.

2.    I have a background in engineering and multiple advanced degrees from U.S. universities.

3.    I am a first-generation American who came to the United States from China.

4.    I have immediate family living in China, as well as immediate family in the United States who would like to travel there.

1

5.    I have travelled frequently to China for work and family visits, and anticipate doing so in the future.

6.    I fear that the Chinese government may retaliate against me or my family members for my participation in this case.

I declare under penalty of perjury that the foregoing is true and correct.

April 6, 2026                    Respectfully submitted,

_____

John Doe
(proceeding under a pseudonym)

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on March 30, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/ Brendan Ballou
Brendan Ballou
Public Integrity Project
D.C. Bar No. 241592
brendan@publicintegrityproject.com
(917) 684-3900
*Counsel for Petitioners*

3