**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-1047**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ZHAOCHENG ANTHONY TAN, et al.,
Petitioners,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
Respondents.

---

On Petition for Review of Agency Action

---

## MOTION TO DISMISS PETITION FOR REVIEW

---

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Petitioners are Zhaocheng Anthony Tan, Garrett Reid, and John Doe.

Respondents are Donald J. Trump, in his official capacity as President of the United States; and Todd Blanche, in his official capacity as Acting Attorney General.

There are no amici in this Court.

### B. Rulings Under Review

The "action[s], finding[s], or determination[s]" ostensibly subject to review in this Court under § 3(a) of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024) (Act), are the decisions memorialized in Executive Orders between January and September 2025 to provide more time for a qualified divestiture, *see* Exec. Order No. 14,350, 90 Fed. Reg. 45,903 (Sep. 23, 2025); Exec. Order No. 14,310, 90 Fed. Reg. 26,913 (June 24, 2025); Exec. Order No. 14,258, 90 Fed. Reg. 15,209 (Apr. 9, 2025); Exec. Order No. 14,166, 90 Fed. Reg. 8611 (Jan. 30, 2025), and the President's determination memorialized in a

September 25, 2025, Executive Order to approve a particular proposed sale of TikTok as a qualified divestiture, *see* Exec. Order No. 14,352, 90 Fed. Reg. 47,219 (Sep. 25, 2025).

### C.     Related Cases

This case was not previously before this Court.  The review scheme has been invoked on one prior occasion, by TikTok and users of TikTok who challenged the constitutionality of the Act.  *See TikTok v. Bondi*, No. 24-1113 (D.C. Cir); *Firebaugh v. Bondi*, No. 24-1130 (D.C. Cir.); *BASED Politics Inc. v. Bondi,* No. 24-1183 (D.C. Cir.); *Kennedy v. Bondi*, No. 24-1316 (D.C. Cir.); *see also TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (affirming that the Act does not violate the First Amendment).

/s/ Brian J. Springer
Brian J. Springer

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................. 1

STATEMENT ................................................................................. 2

ARGUMENT ................................................................................. 7

I.    The Petition for Review Is Untimely ........................................ 7

II.   No Petitioner Has Demonstrated Standing to Challenge the President's and Attorney General's Actions ............................... 9

      A.    Petitioners' Principal Theory of Competitor Shareholder Standing Is Untenable .................................................. 9

      B.    Petitioners' Newly Added Standing Theories Similarly Fail to Satisfy Article III ............................................. 14

CONCLUSION ............................................................................. 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bennett v. Spear,*
520 U.S. 154 (1997) ......................................................................17, 18

*Bronner ex rel. Am. Stud. Ass'n v. Duggan,*
962 F.3d 596 (D.C. Cir. 2020) ...............................................................11

*Carney v. Adams,*
592 U.S. 53 (2020) .................................................................................19

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................14, 20, 23

*Dearth v. Holder,*
641 F.3d 499 (D.C. Cir. 2011) ...............................................................19

*Dinerstein v. Google, LLC,*
73 F.4th 502 (7th Cir. 2023) ..................................................................20

*Dole Food Co. v. Patrickson,*
538 U.S. 468 (2003) ...............................................................................11

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005) ...............................................................................12

*Exxon Mobil Corp. v. Corporacion CIMEX, S.A.,*
111 F.4th 12 (D.C. Cir. 2024), *cert. granted on other grounds,*
146 S. Ct. 80 (2025) ...............................................................................11

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ...............................................................................13

*Franchise Tax Bd. v. Alcan Aluminium Ltd.,*
493 U.S. 331 (1990) ...............................................................................16

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014) ...............................................................................12

*International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
900 F.2d 384 (D.C. Cir. 1990) ....................................................................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................13, 14, 16, 17, 18, 23

*Pileggi v. Washington Newspaper Publ'g Co.*,
146 F.4th 1219 (D.C. Cir. 2025).............................................................20

*Pittsburgh & W. Va. Ry. Co. v. United States*,
281 U.S. 479 (1930) ...............................................................................10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...............................................................................19

*United States v. Palmer*,
578 F.2d 144 (5th Cir. 1978) .................................................................10

**Statute:**

Protecting Americans from Foreign Adversary Controlled Applications Act,
Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024)................................2
§ 2(a)(1), 138 Stat. at 955........................................................2
§ 2(a)(2)(A), 138 Stat. at 956 ..................................................3
§ 2(c)(1), 138 Stat. at 956-57 ..................................................3
§ 2(d)(2), 138 Stat. at 957........................................................3
§ 2(g)(3)(A), 138 Stat. at 958-59 ............................................2
§ 2(g)(6), 138 Stat. at 959........................................................3
§ 3(a), 138 Stat. at 959-60 ...................................................4, 7
§ 3(c), 138 Stat. at 960 ............................................................4
§ 3(c)(2), 138 Stat. at 960 .......................................................8

**Regulatory Materials:**

Exec. Order No. 14,166, 90 Fed. Reg. 8611 (Jan. 30, 2025) ................4

Exec. Order No. 14,258, 90 Fed. Reg. 15,209 (Apr. 9, 2025)...............4

Exec. Order No. 14,310, 90 Fed. Reg. 26,913 (June 24, 2025) ..........................4

Exec. Order No. 14,350, 90 Fed. Reg. 45,903 (Sep. 23, 2025) ...........................4

Exec. Order No. 14,352, 90 Fed. Reg. 47,219 (Sep. 25, 2025) ........................5, 8

**Other Authorities:**

Sundar Pichai,
*Building for Our AI Future*, Google (Apr. 18, 2024),
https://perma.cc/5D87-TY8V ...........................................................13

Privacy Sandbox,
*Update on the Plan for Phase-Out of Third-Party Cookies on Chrome*
(Apr. 23, 2024), https://perma.cc/X3NY-F6CN .............................................12

TikTok,
*Announcement from the New TikTok USDS Joint Venture LLC*
(Jan. 23, 2026), https://perma.cc/H3PG-2UEU.................................................6

## INTRODUCTION

This petition for review challenges a series of Executive Orders that culminated in an Executive Order issued on September 25, 2025 (along with conduct of the Attorney General following the Executive Orders). The September 25 Executive Order exercised the President's authority under the Protecting Americans from Foreign Adversary Controlled Applications Act to determine that a sale of the TikTok mobile application with specified parameters would constitute a "qualified divestiture" under the Act. The petition should be dismissed on two independent threshold grounds.

First, although the last governmental action at issue occurred on September 25, 2025, the petition was not filed until March 5, 2026. The Act has a 90-day statute of limitations, which petitioners missed by several months.

Second, petitioners lack standing. Most of petitioners' alleged harms are premised on their status as shareholders in various corporations. But petitioners are not entitled to assert the interests of those corporations, and in any event the effects of governmental actions on stock prices are highly speculative and thus provide no basis for Article III standing. Petitioners' other standing theories, based on the alleged downstream effect of the

government's action on the employment prospects of a former TikTok employee or on the experience of users of the TikTok application, are likewise premised on highly contingent actions of third parties not before the Court.

These basic threshold flaws provide ample basis for dismissal.  If the Court were instead to proceed to the merits, the parties would need to agree on, or this Court would need to devise, procedures for handling this unusual case that could involve disputes about the contents of the record and the availability of discovery, classified evidence, or other difficult issues.  This plainly meritless petition should be dismissed now.

<strong>STATEMENT</strong>

1.  The Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024) (Act), makes it unlawful for third parties to provide certain services to "distribute, maintain, or update" a "foreign adversary controlled application" in the United States.  Act § 2(a)(1), 138 Stat. at 955.  The Act defines "foreign adversary controlled application" to include any application "operated, directly or indirectly," by "ByteDance, Ltd."; "TikTok"; or subsidiaries or successors of those companies, Act § 2(g)(3)(A), 138 Stat. at 958-59, with the

2

prohibitions as to those entities set to become effective on January 19, 2025, Act § 2(a)(2)(A), 138 Stat. at 956.

An application, including TikTok, may be removed from the Act's ambit by execution of a "qualified divestiture." Act § 2(c)(1), 138 Stat. at 956-57. A "qualified divestiture" is "a divestiture or similar transaction" that "the President determines, through an interagency process," (a) "would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary"; and (b) "precludes the establishment or maintenance of" certain relationships "between the United States operations" of the application "and any formerly affiliated entities that are controlled by a foreign adversary." Act § 2(g)(6), 138 Stat. at 959.

The Act does not contain a private right of action to enforce its prohibitions but instead provides for enforcement by the Attorney General. The Attorney General "shall conduct investigations related to potential violations of" the Act and, "if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue" civil penalties. Act § 2(d)(2), 138 Stat. at 957.

The Act does provide, however, that a "petition for review challenging" the Act itself or "any action, finding, or determination under" the Act may be

filed in this Court.  Act § 3(a), 138 Stat. at 959-60.  Any petitioner challenging an "action, finding, or determination under" the Act must file its petition "not later than 90 days after the date of such action, finding, or determination." Act § 3(c), 138 Stat. at 960.

2.  On January 20, 2025, President Trump signed an Executive Order instructing "the Attorney General not to take any action on behalf of the United States to enforce the Act for 75 days" to allow the Administration "an opportunity to determine the appropriate course forward in an orderly way that protects national security while avoiding an abrupt shutdown of a communications platform used by millions of Americans."  Exec. Order No. 14,166, §§ 1, 2(a), 90 Fed. Reg. 8611 (Jan. 30, 2025).  The President also signed Executive Orders extending the deadline in April, June, and September 2025.  *See* Exec. Order No. 14,350, 90 Fed. Reg. 45,903 (Sep. 23, 2025); Exec. Order No. 14,310, 90 Fed. Reg. 26,913 (June 24, 2025); Exec. Order No. 14,258, 90 Fed. Reg. 15,209 (Apr. 9, 2025).

On September 25, 2025, the President determined that a particular proposed sale of TikTok would be a "qualified divestiture" within the meaning of the Act.  The President explained that he had been presented with a plan "to undergo a qualified divestiture of TikTok's United States

4

operations, as outlined in a framework agreement."  Exec. Order No. 14,352, § 1, 90 Fed. Reg. 47,219 (Sep. 25, 2025).  The President explained that the framework agreement contemplated a sale whereby "TikTok's United States application will be operated by a newly established joint venture based in the United States" and "will be majority-owned and controlled by United States persons."  *Id.*

In an Executive Order issued after the interagency consultation process directed by the Act, the President "determined" that the "divestiture proposed in the Framework Agreement resolves" the "national security concerns" underlying the Act "and complies with the Act because it removes the TikTok application and certain other applications from the 'control' of a foreign adversary and precludes any 'operational relationship' between a formerly affiliated entity controlled by a foreign adversary and the new joint venture."  Exec. Order No. 14,352, § 2(b)(iii).  The President thus "determine[d] that the divestiture of the applications outlined in the Framework Agreement, once its implementation agreements are executed, is a 'qualified divestiture' under the Act."  *Id.* § 2(c); *see also id.* § 4 ("As described in this order, I have determined that the divestiture outlined in the

5

Framework Agreement constitutes a 'qualified divestiture' under the Act[.]").

In January 2026, the relevant private parties announced that the transaction contemplated in the framework agreement had been finalized. As a result of that transaction, a new joint venture—"established in compliance with the Executive Order signed by President Trump on September 25, 2025"—acquired control of TikTok's U.S. operations. *See* TikTok, *Announcement from the New TikTok USDS Joint Venture LLC* (Jan. 23, 2026), https://perma.cc/H3PG-2UEU. *See generally* Am. Pet. 16-17.

3. On March 5, 2026, petitioners Zhaocheng Anthony Tan and Garrett Reid filed this petition for review. Petitioners sought to challenge as ultra vires the President's "extensions for companies to comply with the" Act and the President's "approv[al]" of "a sale of TikTok's American assets." Pet. 4; Pet. 24-27. Petitioners also alleged a "failure to investigate violations of the" Act by the Attorney General that, according to petitioners, was ultra vires and contrary to law. Pet. 27-30. Petitioners asserted a financial injury on the ground that petitioners own stock in Alphabet Inc. or in Meta Platforms, Inc., which host video-sharing platforms (YouTube and Instagram, respectively) that are alternatives to TikTok. *See* Pet. 21-24.

6

On April 6, 2026, petitioners filed an amended petition challenging the same actions on materially identical grounds. *See* Am. Pet. 38-44. The amended petition adds a new petitioner, proceeding under the pseudonym John Doe, who is a former employee of ByteDance. He claims injury because the government's actions and inactions allegedly impaired the value of stock that he owns in ByteDance, and because he was terminated following the sale of TikTok. Am. Pet. 35-37. The amended petition also claims that Reid is injured by the challenged actions based on his use of the TikTok application. He asserts that the sale of TikTok has created a risk of "malfunctions" in the application (impairing his experience as a user) and has created a risk that his data will be shared with ByteDance and, ultimately, the Chinese government. Am. Pet. 30-32.

## ARGUMENT

### I. The Petition for Review Is Untimely

Petitioners missed the deadline to file their petition for review by several months. The only "action[s], finding[s], or determination[s] under th[e Act]" ostensibly subject to review in this Court, Act § 3(a), 138 Stat. at 959-60, are the decisions memorialized in Executive Orders between January and September 2025 to provide more time for a qualified divestiture, and the

determination memorialized in the September 25, 2025, Executive Order to approve the proposed divestiture outlined in the framework agreement. Petitioners do not identify any other discrete action, finding, or determination by the government after September 25, 2025.

The Act's statute of limitations provides that claims must be filed "not later than 90 days after the date of" the challenged "action, finding, or determination." Act § 3(c)(2), 138 Stat. at 960. Thus, petitioners had to file their petition by late December 2025. Yet petitioners did not file until March 5, 2026—more than two months later and more than 160 total days after September 25, 2025.

It makes no difference that the private parties consummated the transaction on January 22, 2026. *See* Am. Pet. 16-17. The latest ostensibly reviewable government action was the September 2025 Executive Order, which constituted the President's formal determination of a qualified divestiture under the Act. *See* Exec. Order No. 14,352, § 4 ("I have determined that the divestiture outlined in the Framework Agreement constitutes a 'qualified divestiture' under the Act[.]"). The President's January 2026 social-media post merely announced that the implementing agreements had been executed. *See* Am. Pet. 17. And although petitioners

8

may believe that certain details were not publicly known before the deal was finalized, *see* Am. Pet. 20-21, they had the vital information that they needed to bring a challenge within the time specified by the statute. *See, e.g., International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 900 F.2d 384, 386-87 (D.C. Cir. 1990) (per curiam) (granting motion to dismiss untimely petition for review).

## II.     No Petitioner Has Demonstrated Standing to Challenge the President's and Attorney General's Actions

The petition is independently barred because petitioners lack standing. Petitioners primarily assert Article III injury as stockholders in corporations that are competitors with the subject of the regulatory actions. Case law forecloses that tenuous theory of standing on multiple grounds. And petitioners cannot rehabilitate this fatal deficiency by adding a new petitioner, who similarly claims injury as a stockholder, or by advancing a hodgepodge of new standing theories in their amended petition that require speculation about actions by third parties.

### A.     Petitioners' Principal Theory of Competitor Shareholder Standing Is Untenable

The sole standing theory that appeared in petitioners' initial petition is not viable. Petitioners Zhaocheng Anthony Tan and Garrett Reid own

shares in the parent companies of YouTube and Instagram, respectively. Am. Pet. 32. They allege that decisions related to enforcement of the Act against TikTok have affected the price of their stock because "YouTube and Instagram compete with TikTok for sharing and viewing videos." *Id.* In other words, petitioners claim that the President's determination has diminished the value of companies that host video-sharing platforms that are alternatives to TikTok, and that petitioners "have suffered financially" because they own stock in those companies. Am. Pet. 35. That sweeping theory of standing finds no support in case law for two reasons: shareholders cannot assert injuries allegedly suffered by corporations, and those alleged injuries are too speculative to be cognizable.

It is well established that stockholders cannot assert "the indirect harm which may result to every stockholder from harm to the corporation." *Pittsburgh & W. Va. Ry. Co. v. United States*, 281 U.S. 479, 487 (1930). For decades, courts have recognized that "[t]he law is clear that only a corporation and not its shareholders, not even a sole shareholder, can complain of an injury sustained by, or a wrong done to, the corporation." *United States v. Palmer*, 578 F.2d 144, 145-46 (5th Cir. 1978) (per curiam).

10

This rule respects the "basic tenet of American corporate law" that "the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Allowing individual shareholders like petitioners to sue when they have suffered no "harm independent of that visited upon the corporation and the other shareholders" would violate "the established tenet" that litigants must assert "their own legal rights and interests," not those "of third parties." *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 607 (D.C. Cir. 2020) (quotations omitted). Petitioners' approach flouts this principle and has no logical stopping point. Dismissal is warranted under the settled rule that "a shareholder's direct rights generally are not implicated by state action that depreciates the value of a corporation's shares, even severely." *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 27 (D.C. Cir. 2024) (quotations omitted), *cert. granted on other grounds*, 146 S. Ct. 80 (2025).

Petitioners' theory here is barred for the independent reason that the injuries they allege are impermissibly speculative. Petitioners do not challenge any action done directly by or to the companies in which they own shares. Rather, petitioners allege that regulatory actions directed at a

11

competitor of those companies have incidental effects on the companies, which in turn affects the value of petitioners' stock.

That tenuous chain of inferences falls woefully short of establishing Article III standing to bring this challenge. Petitioners are forced to resort to guesswork about how the President's or the Attorney General's actions related to TikTok have permeated or will permeate to other players in the market. Stock prices depend on a "tangle of factors," ranging from "economic circumstances" to "investor expectations" to "new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Indeed, "the market price of [a company's] shares" is not driven only by singular events but instead "reflects all publicly available information" about the company. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (quotations omitted).

Various confounding factors could be responsible for the changes in stock price that petitioners identify. For example, while petitioners key a $1.18 rise in Alphabet's stock price to the Act's April 24, 2024, enactment, *see* Am. Pet. 34, Google made multiple company announcements in the same timeframe, *see* Privacy Sandbox, *Update on the Plan for Phase-Out of Third-Party Cookies on Chrome* (Apr. 23, 2024), https://perma.cc/X3NY-F6CN;

Sundar Pichai, *Building for Our AI Future*, Google (Apr. 18, 2024), https://perma.cc/5D87-TY8V.  Similarly, while petitioners believe that the President's September 25, 2025, approval of TikTok's divestiture accounted for a $1.26 drop in Alphabet's stock price, *see* Am. Pet. 34, Google was simultaneously facing a remedies trial for an earlier finding of antitrust liability, *see United States v. Google LLC*, No. 23-cv-108 (E.D. Va.).  The speculation inherent in disentangling the causes of stock price fluctuations underscores why courts decline to adjudicate such disputes.

Petitioners' own assertions are premised on their forecasts about how scores of investors perceive the value of Alphabet and Meta in light of government actions taken with respect to TikTok.  *See* Am. Pet. 32-35.  Petitioners "cannot establish Article III standing" by relying on "distant (even if predictable) ripple effects" that are "far removed" from the challenged "government action."  *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).  And the effects are hardly predictable in this case because they hinge on "the unfettered choices made by independent actors not before the courts" whose diverse investment strategies and decisions "the courts cannot presume either to control or to predict."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotations

omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 n.7 (2013) (rejecting arguments based on conjecture about how third parties may react). By the same token, there is no sound basis to conclude that declaring the President's approval unlawful or ordering an investigation by the Attorney General would remedy petitioners' asserted harms as stockholders in companies that compete with TikTok. *See Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quotations omitted)).

### B. Petitioners' Newly Added Standing Theories Similarly Fail to Satisfy Article III

Perhaps recognizing the deficiencies in their initial petition, petitioners offer a scattershot of additional theories of injury in their amended petition. The newly added petitioner advances a similarly flawed stockholder theory and also asserts that he was fired by ByteDance because of the divestment. One of the original petitioners newly declares that he has suffered injuries related to his use of the TikTok application. None of those asserted injuries provides a basis for Article III standing.

1. Like the allegations in the original petition, the allegations regarding the new petitioner, John Doe, are premised on a fundamentally flawed shareholder standing theory. Doe claims that the price of the stock

he owns in ByteDance is "pegged to the company's current fair value."  Am. Pet. 35.  According to Doe, because ByteDance accepted a deal that underestimated the worth of its assets, "ByteDance's value was far less than it otherwise would have been," and accordingly Doe's "stock in ByteDance [is] worth less than [it] would be" otherwise.  Am. Pet. 35-36.

As evidenced by the fact that petitioners simultaneously argue that the government's actions in this case harmed ByteDance and harmed its competitors, these standing arguments are riddled with speculation.  There is no reliable way to gauge how a deal with terms different than the one that ByteDance accepted—even assuming such a deal would be reached—would affect the value of Doe's stock units.  Petitioners offer little reason to assume that a different deal with a higher cash payment but a lower equity stake was more favorable to ByteDance.  *See* Am. Pet. 28-29.  Petitioners also fail to distinguish between immediate- and long-term impact, even though Doe professes no intent to sell his stock at any specific time.  And it is hypothetical that ByteDance would receive another approvable deal consistent with protecting the United States' national security on terms acceptable to ByteDance that would increase the company's value by even greater margins.  Causation and redressability become "substantially more

difficult" to show where, as here, standing depends on how independent actors will behave. *Lujan*, 504 U.S. at 562.

Doe's stockholder theory also brings into sharp focus that, at base, he simply disagrees with ByteDance's business decision to sell on particular terms or at a particular price. Even if the government expressed a preference for one deal or purchaser over another, *see* Am. Pet. 35, ByteDance's board had to independently approve the deal, and petitioners' alleged financial harm is neither directly traceable to the President's determination nor likely redressed by setting aside the President's determination. In criticizing the deal without any legitimate basis to question ByteDance's "good-faith business judgment," Doe also seeks an end-run around the "longstanding equitable restriction," discussed above, that typically bars individual stockholders from filing lawsuits to vindicate the legal rights and interests of the companies in which they have stock. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990).

Nor has petitioner Doe established standing based on the termination of his employment by ByteDance. Doe alleges that he "is a former employee of one of the U.S.-based entities of ByteDance." Am. Pet. 6. Although his factual allegations are difficult to follow, Doe alleges that he "was placed

under the management of a foreign-based boss" after the transaction to "maintain the fiction of separation." Am. Pet. 36. Allegedly because this boss "did not understand Doe and his colleagues' work," "Doe and several colleagues were laid off." Am. Pet. 36-37. Doe asserts that he "would have remained employed" for "TikTok's American operations" if "ByteDance and TikTok U.S. actually severed." *Id.*

Doe's employment-related injury does not serve as a proper basis to bring this petition for review. Because Doe's asserted injury stems from "the independent action of some third party not before the court," demonstrating standing is "substantially more difficult." *Lujan*, 504 U.S. at 560, 562 (quotations omitted). Such mediated injury will generally only suffice for standing purposes if the challenged government conduct has a "determinative or coercive effect upon the action" that directly causes the plaintiff's injury. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). That could not be further from the case here, when the effect of any action or inaction by the U.S. government has, at most, a tenuous connection to employment actions by ByteDance.

In many respects, the basis for Doe's assertion that his reassignment to the particular supervisor with whom Doe clashed has any connection to

TikTok's divestiture is unclear.  But in any event, Doe's ultimate termination was the product of a series of decisions made by third parties, including ByteDance's determinations about how to organize its operations and the unnamed supervisor's determinations about which employees to retain or lay off.  None of those decisions is fairly traceable to—that is, they were neither coerced nor determined by, *Bennett*, 520 U.S. at 169—the President or the Attorney General.  The termination at the end of that third-party decision chain thus provides no basis for standing.

Relatedly, Doe has also failed to establish that his termination-related injury would likely be redressed if petitioners were to prevail in this suit and this Court were to declare the President's approval of the transaction unlawful.  Doe's theory of redressability appears to rest on a belief that ByteDance would respond to any court decision by reverting to some previous organizational structure with Doe's former role again supervised by U.S.-based personnel; that ByteDance would then seek to hire one or more engineers into that former role; and that Doe would apply and likely be rehired.  But nothing in the petition establishes that any such causal chain is likely to occur.  *Lujan*, 504 U.S. at 561.  Indeed, Doe does not even allege that he is "able and ready to apply" for any such position if one were to

become available.  *Carney v. Adams*, 592 U.S. 53, 63 (2020) (quotations omitted).  The amended petition likewise lacks any allegations to support the conclusion that, as a result of a decision in petitioners' favor, ByteDance will reshuffle Doe's former role to a different U.S.-based supervisor and will seek to hire new engineers into that role.

2.  For the first time in the amended petition, petitioner Garrett Reid asserts two injuries related to his ongoing use of TikTok.  He claims that the data he has provided to TikTok may be misused by ByteDance and, ultimately, the Chinese government.  Am. Pet. 30-31.  And he claims a risk that he will experience a degraded user experience following the sale.  Am. Pet. 31-32.  Each of those theories of standing fails.

a.  As an initial matter, Reid does not demonstrate any cognizable "ongoing injury" or "immediate threat of injury" to seek forward-looking relief.  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  As the Supreme Court has explained, to establish standing litigants must "identif[y] a close historical or common-law analogue for their asserted injury."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  Reid's data-sharing assertions do not satisfy this standard.

While invasion of individual privacy would likely be a cognizable injury under this standard, petitioners do not allege that TikTok is sharing, on any ongoing basis, individualized user data with ByteDance. *Cf. Pileggi v. Washington Newspaper Publ'g Co.*, 146 F.4th 1219, 1227-31 (D.C. Cir. 2025) (holding that a party suffers a "concrete injury" "analogous to" the common-law harms of "intrusion upon seclusion" and "publicity given to private life" when her "private viewing history" is "provided without consent to a third party"). Instead, petitioners allege only that TikTok has continued to share "aggregated American users' data" with ByteDance. Am. Pet. 30. And petitioners nowhere explain how TikTok's alleged sharing of aggregated, rather than individualized, data causes any individualized injury at all, much less reflects a harm analogous to that cognizable at common law. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 512-14 (7th Cir. 2023) (rejecting claim that plaintiff had standing based on common-law analogues when his anonymized medical data was shared with a third party without his consent).

Moreover, Reid has failed to show any non-speculative, "certainly impending" risk that his data will be shared with ByteDance. *Clapper*, 568 U.S. at 401. Petitioners allege that TikTok has approximately 170 million American users. Am. Pet. 1. Even assuming that some of those users' data

20

is included within aggregated information shared with ByteDance, Reid has not provided any reason to believe that his particular data—out of all of the data generated by 170 million users—has been (or will imminently be) included in any aggregated data that is shared with ByteDance much less that ByteDance or the Chinese government has a particular interest in his data.

Reid's allegations regarding the user experience do not suffice to demonstrate an injury-in-fact. Petitioners nowhere attempt to tie the degradation in user experience to any injury cognizable at common law, as would be necessary to support this theory of standing. Regardless, even if such an injury were cognizable, Reid nowhere establishes a non-speculative, imminent risk that he will experience such an injury. Notably, Reid does not allege that he has experienced any operational problems with TikTok since the sale; instead, he relies on reports of other users' experiencing problems. And indeed, in the main, Reid appears to be highlighting a single past incident apparently caused by "an outage at the datacenter of" Oracle. Am. Pet. 32. Reid provides no basis for believing that future such outages are likely to occur—let alone that one is sufficiently imminent to establish standing.

21

b.  In any event, Reid has failed to demonstrate that any of those alleged injuries is fairly traceable to the challenged conduct or would be redressed by a favorable decision.  Here, the injuries that Reid asserts are attributable to the choices of the various companies managing TikTok.  Reid's allegations that TikTok and ByteDance have misused, and will continue to misuse, user data, *see* Am. Pet. 30, reflect independent choices made by those companies; Reid nowhere suggests that the President and the Attorney General have influenced, much less coerced, those companies into misusing data.  Similarly, Reid's allegations about TikTok's "operational problems" and about an "outage" at Oracle's datacenter affecting TikTok, Am. Pet. 31-32, reflect the companies' own management of the application.  Again, Reid nowhere suggests (and could not plausibly suggest) that the President's and the Attorney General's challenged actions have had any determinative or coercive effect on how well or poorly TikTok is currently operating its application.

And the lack of traceability is further underscored by the fact that Reid has voluntarily chosen to use TikTok "since 2024," prior to the divestment.  Am. Pet. 30.  To the extent that he is concerned about injuries stemming from that choice, such concerns would reflect "self-inflicted

injuries" that "are not fairly traceable to the Government's" actions. *Clapper*, 568 U.S. at 418.

Nor has Reid demonstrated that it is "likely, as opposed to merely speculative, that the injury" he asserts "will be redressed by a favorable decision," particularly when his "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 561-62 (quotations omitted). Petitioners fail to demonstrate that Reid's asserted injuries will likely be redressed by setting aside the challenged actions. Given that Reid has been "a TikTok user for several years" with a "TikTok account since 2024," it is likely that ByteDance has already had access to "his user data"—such as "his name, contact information, location, and viewing history." Am. Pet. 30-31. And it is unclear how any forward-looking relief could ameliorate the risks of data misuse about which Reid asserts a concern.

Nor is it clear how the relief that petitioners seek would redress "the risk of ongoing malfunctions." Am. Pet. 32. Petitioners' contrary supposition appears to rest on the assumption that, if the approval of the challenged deal were set aside, TikTok would be sold to a more "experienced" or "competent"

owner than Oracle. *Id.* But petitioners never substantiate that assertion or demonstrate that such an outcome would be likely.

Indeed, the immediate effect of a decision in petitioners' favor would be to prohibit TikTok from continuing to operate in the United States, unless and until a new divestiture can be negotiated and approved. It is hard to see how making the application entirely unavailable would redress any injury associated with alleged inadequacies in the application. And ByteDance's ability to negotiate and obtain approval for a new deal that would make the application available again—to say nothing of how the application would operate if such a deal were consummated—is highly speculative.

# CONCLUSION

For the foregoing reasons, the Court should dismiss the petition for review.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

 */s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

May 2026

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,786 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ *Brian J. Springer*
Brian J. Springer