# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ZHAOCHENG ANTHONY TAN,

GARRETT REID, and

JOHN DOE,

      Petitioners,

v.

DONALD TRUMP, in his official capacity as President of the United States, and

TODD BLANCHE, in his official capacity as Acting Attorney General,

      Respondents.

Case No. 26-1047

## PETITIONERS' OPPOSITION
## TO RESPONDENTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ...................................................................................... 1

Background ........................................................................................ 2

Legal Standard ................................................................................. 6

Argument ........................................................................................... 7

I. Petitioners' action is timely. ......................................................... 7

II. Petitioners have standing. ........................................................ 12

A. Petitioner Reid's user data is being shared with ByteDance and the Chinese government. ........................................................... 13

B. Petitioners lost money. ........................................................... 18

Conclusion ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Ainsworth v. Islamic Republic of Iran,*
No. 1:23-CV-2424-RCL, 2026 WL 375822 (D.D.C. Feb. 10, 2026) . 16

*Aronson v. Lewis,*
473 A.2d 805 (Del. 1984) .................................................................. 20

*Block v. Meese,*
793 F.2d 1303 (D.C.Cir.1986) .......................................................... 23

*Chlorine Chemistry Council v. EPA,*
206 F.3d 1286 (D.C. Cir. 2000) .......................................................... 7

*Citizens for a Better Env't v. Costle,*
617 F.2d 851 (D.C. Cir. 1980) ........................................................... 10

*Collins v. Mnuchin,*
938 F.3d 553 (5th Cir. 2019) ...................................................... 18, 19

*Collins v. Yellen,*
594 U.S. 220 (2021) ........................................................................... 20

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
563 F.3d 466 (D.C. Cir. 2009) .......................................................... 23

*D&F Afonso Realty Tr. v. Garvey,*
216 F.3d 1191 (D.C. Cir. 2000) .......................................................... 7

*FAIC Sec., Inc. v. United States,*
768 F.2d 352 (D.C. Cir. 1985) .......................................................... 18

*Fed. Express Corp. v. U.S. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) .......................................................... 22

*Fraley v. Facebook, Inc.,*
830 F. Supp. 2d 785 (N.D. Cal. 2011) .............................................. 13

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002)......................................................10

*Gettman v. Drug Enf't Admin.*,
  290 F.3d 430 (D.C. Cir. 2002)........................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).....................................................................24

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015)........................................................23

*James Madison Ltd. by Hecht v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996)......................................................19

*Learning Res., Inc. v. Trump*,
  ——— U.S. ——— (2026)...............................................................22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).....................................................................19

*Liberty Prop. Tr. v. Republic Props. Corp.*,
  577 F.3d 335 (D.C. Cir. 2009)......................................................23

*Muransky v. Godiva Chocolatier, Inc.*,
  922 F.3d 1175 (11th Cir. 2019).....................................................13

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1222 (N.D. Cal. 2014) ...........................................13

*Planned Parenthood v. American Coalition of Life Activists*,
  290 F.3d 1058 (9th Cir. 2002).......................................................13

*Soundboard Ass'n v. Fed. Trade Comm'n*,
  888 F.3d 1261 (D.C. Cir. 2018).....................................................11

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025)..........................................................................3

*Town of Stratford, Connecticut v. FAA*,

285 F.3d 84 (D.C. Cir. 2002).............................................................7

*Tozzi v. HHS*,
271 F.3d 301 (D.C.Cir. 2001)........................................................24

*V.O.S. Selections, Inc. v. United States*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade).........................................22

*Van Patten v. Vertical Fitness Group LLC*,
847 F.3d 1037 (9th Cir. 2017).......................................................13

**Court Documents**

Petition, *TikTok Inc. et al. v. Garland*,
Doc. No. 2055084 (D.C. Cir. May 17, 2024)..................................15

**Executive Orders**

Exec. Order No. 14352, Saving TikTok While Protecting National
Security, 90 Fed. Reg. 47219 (Sept. 25, 2025)..............................8

**Statutes**

Protecting Americans From Foreign Adversary Controlled
Applications Act. H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50
(April 24, 2024) ..............................................................................3

**Other Authorities**

Daniel J. Solove and Danielle Keats Citron, *Privacy Harms*, 102 B.U.
L. Rev. 793 (2022) ........................................................................13

Miriam Gottfried and Amrith Ramkumar, *Trump Administration Set
to Receive $10 Billion Fee for Brokering TikTok Deal*, Wall St. J.
(Mar. 13, 2026) ..............................................................................9

*Privacy Policy*, TikTok (Feb. 5, 2025)................................................16

# INTRODUCTION

TikTok is an enormously popular social media app: about 170 million Americans, and nearly a quarter of the world's population, use it every month. Because TikTok was created by a Chinese company—ByteDance, Ltd.—officials have long feared that the app could be used to harvest sensitive personal data from American users. To address that threat, Congress in 2024 passed a law requiring TikTok to either end its "operational relationship" with ByteDance or cease U.S. operations within 270 days. Congress provided criteria to be used in determining whether the operational relationship had in fact ceased, and it assigned the duty to apply those criteria to the President.

The President failed to follow that law. He first granted ByteDance several illegal extensions. Then, over a year after the statutory deadline for divestment, he approved a deal that allowed ByteDance and TikTok to maintain an intimate operational relationship. This creates an enormous national security risk, as ByteDance continues to access Americans' sensitive user data, and remains capable of pushing propaganda into the country: all risks that the law was meant to stop.

Respondents now move to dismiss, arguing that the statute of limitations for challenging their actions has passed, and that Petitioners lack an injury sufficient to confer standing. These arguments fail. Petitioners brought their case within weeks of the President's approval of the deal—suing any sooner would have been premature. And Petitioners are suffering several cognizable harms, chief among them the very harm that Congress sought to prevent by enacting the law: their sensitive personal data is being shared with ByteDance and the Chinese government.

## BACKGROUND

TikTok is one of the world's most popular social media apps. Amended Petition ("Am. Pet.") ¶ 19–20. But because it was created by a Chinese company—ByteDance, Ltd.—that is subservient to that country's government, experts and government officials both have long worried that the app could be used to gather Americans' sensitive data, and to push Chinese propaganda. *Id.* ¶ 21.

This is not a speculative risk. As the Supreme Court explained, "China has engaged in extensive and years-long efforts to accumulate structured datasets, in particular on U.S. persons, to support its intelligence and counterintelligence operations." *TikTok Inc. v.*

*Garland*, 604 U.S. 56, 75 (2025) (internal quotation marks omitted). Willingly or not, ByteDance can be roped into this effort, as it "is subject to Chinese laws that require it to assist or cooperate with the Chinese Government's intelligence work and to ensure that the Chinese Government has the power to access and control private data' the company holds." *Id.* at 63–64. (internal quotation marks omitted).

For this reason, in 2024, Congress passed, and the President signed, the Protecting Americans From Foreign Adversary Controlled Applications Act. H.R. 815, div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024) (the "TikTok Law"). That law prohibited TikTok's operation within the United States unless the President certified, within 270 days, that ByteDance had ceased any "operational relationship" with TikTok's domestic operations.

Despite the risks to Americans and national security, Respondents ignored the law. Without any authority, President Trump issued an executive order purportedly extending ByteDance's deadline to divest TikTok's American operations. Am. Pet. ¶ 35. He then issued four more such extensions, all in violation of the law. *Id.* ¶¶ 36–40. And he specifically directed the Attorney General not to

3

enforce the law, despite a unique statutory direction that the Department of Justice affirmatively do so. *Id.*

Finally, on January 22, 2026—more than a year after the deadline set by law—the President approved a deal to sell TikTok's American assets to various companies that contributed millions to the President's political projects or invested billions in his personal businesses. *Id.* ¶ 43. These companies acquired TikTok at a price so low that one analyst called the deal "daylight robbery." *Id.* ¶ 68. Moreover, the President rejected a competing offer to buy TikTok for $6 billion more than the price offered by the winning consortium. *Id.* ¶¶ 71–75. The difference: the competing bidders had not, as the winners had, enriched the President. *Id.*

The deal the President approved, like the many extensions that preceded it, facially violated the law. Under the statute, ByteDance cannot have an ongoing "operational relationship" with TikTok's severed American operations. But under the announced deal, ByteDance continues to own the app's essential recommendation algorithm and licenses it to the new TikTok entity. *Id.* ¶ 46. ByteDance also continues to operate the new TikTok entity's ecommerce, marketing, and advertising operations. *Id.* ¶ 47. And the CEO of

TikTok's global operations, which is still owned by ByteDance, sits on the new American entity's board. *Id.* ¶ 48.

TikTok's American and global entities continue to be intimately entwined, sharing software systems, machine learning and AI models, and personnel, including legal and human resources staff. *Id.* ¶ 6. ByteDance's employees continue to demand—and receive—American user data. *Id.* ¶ 57. And both ByteDance and the new American entity jointly launch new product features, such as a recent change to track users' specific GPS locations. *Id.* ¶ 58. In fact, in the Apple and Google app stores in the United States, the TikTok app continues to be published by ByteDance, not the new American entity. *Id.* ¶ 59.

In short, under the announced deal, ByteDance still controls all the essential elements of TikTok, and continues to access American users' data. Such a deal subverts the very purpose of the TikTok Law, as ByteDance can continue to push Chinese propaganda, censor the content it does not like, and extract American user data it desires. These were exactly the harms that the TikTok Law was intended to prevent.

This deal harms Petitioners in three primary ways.

*First*, Petitioner Garrett Reid uses the TikTok app, and as such is having his data illegally shared with ByteDance. *Id.* ¶ 77–79. This is the exact harm that the TikTok Law was meant to prevent, and is the result of Respondents' failure to follow the law.

*Second*, Petitioners Reid and Tony Tan are investors in competitors to TikTok, which predictably benefitted when the law was likely to be enforced, and predictably suffered when it was not. *Id.* at ¶ 82-87.

*Third*, Petitioner John Doe is a former employee of ByteDance, whose investment in ByteDance itself suffered because Respondents directed fire sale of ByteDance's chief asset—TikTok's U.S. operations—to various allies of the President. *Id.* at ¶ 88-90.

Respondents' blatant, unapologetic violation is an affront to all our institutions that try to uphold the rule of law. It threatens our national security. And it directly harms Petitioners.

## LEGAL STANDARD

Where, as here, this Court has original jurisdiction, and when Respondents move to dismiss a case on standing grounds, the Petitioners' allegations are interpreted "in the light most favorable to

6

the petitioner." *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000).

Courts will deny a motion to dismiss where the challenged action has a "substantial probability" of injuring Petitioner. *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000) (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C.Cir.1996)). This Court may decide whether Petitioners have standing based on their petition alone, or it may order further briefing and factual development on the issue. *See, e.g.*, *Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 432 (D.C. Cir. 2002); *Town of Stratford, Connecticut v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002).

## ARGUMENT

### I.  Petitioners' action is timely.

In their motion to dismiss, Respondents make no effort to argue that they have complied with the law, and any effort to do so would be foolish. Instead, they argue that Petitioners failed to challenge their illegal action in time. Motion to Dismiss ("MTD") at 7–9. This is incorrect. The President endorsed, and ByteDance announced, the divestiture of TikTok's American assets on January 22, 2026. Petitioners filed their lawsuit a few weeks later, on March 5, 2026.

As Respondents correctly note, the TikTok Law requires that a challenge to an "action, finding, or determination" under the law be brought within 90 days of that action, finding, or determination. TikTok Law § 3(c)(2). The relevant action, they argue, was the President's fifth executive order on the topic, in which he announced a "framework" for a sale that he said would, once completed, constitute a "qualified divestiture" under the TikTok Law. Am. Pet. ¶¶ 40–41 (citing Exec. Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025)). The "framework" did not say, however, what assets would be sold, or even who would buy them (the buyers were not announced). *Id.*

Respondents argue that this announcement was the final "action, finding, or determination" that Petitioners must challenge, and that they did so too late. MTD at 7–9. The problem for Respondents is that the President himself, in the executive order they cite, said that no such final determination had been made. Rather, he announced that "that the divestiture of the applications outlined in the Framework Agreement, *once its implementation agreements are executed*, is a 'qualified divestiture' under the [TikTok law]." Exec.

Order No. 14352, Saving TikTok While Protecting National Security, 90 Fed. Reg. 47219 (Sept. 25, 2025) (emphasis added).

In other words, the President's approval was conditional on the actual agreement being finalized, and he retained the authority not to approve the final deal. In fact, the President continued to negotiate over the deal for months afterwards. *See* Miriam Gottfried and Amrith Ramkumar, *Trump Administration Set to Receive $10 Billion Fee for Brokering TikTok Deal*, Wall St. J. (Mar. 13, 2026), https://www.wsj.com/tech/tiktok-deal-fee-trump-administration-5aa31c9f (in announcing the "framework," President Trump said that he was still negotiating the final agreement).

Ultimately, on January 22, 2026, a new legal entity, TikTok USDS Joint Venture LLC ("TikTok U.S."), announced that a deal to sell the company's domestic assets had finally been reached. Am. Pet. ¶ 46. That same day President Trump, as he often does with major policies, announced his final approval of the deal on Truth Social. *Id.* ¶ 47. Petitioners filed their action six weeks later, well within the TikTok Law's statute of limitations.

Even if the President had not himself stated that his September 25, 2025 order was not a final determination, Petitioners action still would be timely.

To begin, the September order was not ripe to be challenged. "To determine whether a controversy is ripe for judicial review the court must evaluate 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The ripeness requirement is designed "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Citizens for a Better Env't v. Costle*, 617 F.2d 851, 853 (D.C. Cir. 1980) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)).

The problem is that if Petitioners had to challenge the September order, both they and the Court would have to guess at how the administration's final action would unfold. The President's September

10

announcement did not describe the terms of the proposed divestment, or even who TikTok was being divested to. Requiring litigation then would force the parties to speculate about how the President's negotiations with ByteDance would play out, and force this Court to interfere with the administration's decision-making before it was complete.

For similar reasons, the September order was not a final agency action under the Administrative Procedure Act. Agency actions are final if "(1) the action 'mark[s] the consummation of the agency's decision-making process' and is not 'of a merely tentative or interlocutory nature;' and (2) it is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Ultimately, Respondents' position, if accepted, would nullify Congress's intent in enacting the TikTok law by entirely insulating divestment determinations from judicial review. The President may not evade the law by making an "approval" order so nebulous it cannot

11

be challenged, letting the statute of limitations run, and only then announcing the key details. Petitioners' case is timely.

## II. Petitioners have standing.

Respondents alternatively argue that, even if Petitioners brought a timely case, they lack standing to sue because they have not suffered cognizable injuries. This is false.

Respondents have harmed Petitioners in three primary, though not exhaustive, ways. *First* and most importantly, the President approved a facially illegal deal that permitted TikTok U.S. to share extraordinarily sensitive American user data with ByteDance, the exact outcome the TikTok Law was meant to stop. *Second*, by failing to follow the law, the President hurt the stock of TikTok's competitors. *Third*, by orchestrating a fire sale of TikTok's American assets to his business and personal allies, he hurt the stock of ByteDance itself. Additionally, because the President orchestrated a sale to his inexperienced benefactors, the TikTok app itself has suffered, and John Doe lost his job. These are all harms that federal courts recognize, and are fairly traceable to Respondents' actions.

12

### A. Petitioner Reid's user data is being shared with ByteDance and the Chinese government.

As described above, a primary purpose—perhaps the primary purpose—of the TikTok Law was to prevent sensitive American user data from being shared with ByteDance. Yet this is exactly what is happening.

The misappropriation of personal data is universally recognized as a harm conferring standing in federal court. *See, e.g.*, *Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (plaintiff has standing when the disclosure of information creates a risk of physical harm); *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019) (economic harm); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014) (reputational harm); *Van Patten v. Vertical Fitness Group LLC*, 847 F.3d 1037 (9th Cir. 2017) (personal inconvenience or disturbance); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011) (misuse of data without consent). *See generally*, Daniel J. Solove and Danielle Keats Citron, *Privacy Harms*, 102 B.U. L. Rev. 793 (2022).

The data that TikTok U.S. and ByteDance are misappropriating is extraordinarily sensitive. The app "Reads Your Mind," Am. Pet.

¶ 20, and collects information on users' identities, locations, personal and private interests, contacts, and messages. The situation is especially serious here, where this data is being shared with a Chinese company subject to the dictates of that country's dictatorship, which can use this information for surveillance, impersonation, or blackmail. Preventing this harm was precisely the purpose of the TikTok law.

Unable to argue that the misappropriation of data is permissible, Respondents are left to argue that Petitioners' allegations are simply speculative. MTD at 20. Respondents' arguments about the weight of evidence are inappropriate for a motion to dismiss—as noted, Petitioners' allegations are interpreted in the light most favorable to Petitioners at this stage.

In any case, the allegations are not speculative; five discrete sources support them:

- **Whistleblower allegations:** John Doe, a former TikTok employee himself, has alleged that TikTok U.S. continues to share user data with ByteDance. Am. Pet. ¶ 57.
- **TikTok's own admission:** TikTok U.S. admitted that ByteDance would continue to manage the app's international operability,

ecommerce, advertising, and marketing operations, all of which require American user data. *Id.* ¶ 47.

- **Shared app:** The unique identification number for the TikTok app in the Apple app store—the number that confirms whether an app is the same of different across countries—is the same in the United States as it in Russia, Iraq, Serbia, and Pakistan. *Id.* ¶ 60. By necessity, American user data is therefore shared with the international app that ByteDance controls.

- **Shared internal software:** TikTok U.S. relies on ByteDance's internal software for its own operations, which ByteDance previously admitted would violate the TikTok Law. Am. Pet. ¶ 56; Petition, *TikTok Inc. et al. v. Garland*, Doc. No. 2055084 (D.C. Cir. May 17, 2024) ("Moreover, to keep the platform functioning, these engineers [at TikTok U.S.] would need access to ByteDance software tools, which the Act prohibits.")).

- **TikTok's privacy policy:** Perhaps most damning of all, TikTok U.S. admits that it shares extraordinarily sensitive information with ByteDance *in its own privacy policy*. In its current privacy policy, TikTok U.S. says that it reserves the right to share the following information with TT Commerce & Global Services LLC,

a ByteDance subsidiary: "Account information, such as date of birth, username password, email, phone number, and profile image;" "User content, including comments, photographs, livestreams, audio recordings, videos, and text that you choose to create;" "Messages, including content you compose, send, or receive;" and "AI interactions, including prompts, questions, files, and other types of information that you submit." *Privacy Policy*, TikTok (Feb. 5, 2025), https://www.tiktok.com/legal/page/us/privacy-policy/en. In other words, TikTok U.S. concedes to sharing the very information that Respondents say is merely speculative.[1]

---

[1] As here, "Federal courts may take judicial notice of adjudicative facts that are 'not subject to reasonable dispute" and that are 'either (1) generally known within the territorial jurisdiction … or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Ainsworth v. Islamic Republic of Iran*, No. 1:23-CV-2424-RCL, 2026 WL 375822, at *2 (D.D.C. Feb. 10, 2026) (quoting Fed. R. Evid. 201(b)). Respondents have included new factual materials in their motion to dismiss. *See* MTD at 12 (Privacy Sandbox, *Update on the Plan for Phase-Out of Third-Party Cookies on Chrome* (Apr. 23, 2024), https://perma.cc/X3NY-F6CN); *id.* at 13 (citing Sundar Pichai, *Building for Our AI Future*, Google (Apr. 18, 2024), https://perma.cc/5D87-TY8V). Petitioners request this Court take judicial notice of both sides' additions, or deny Respondents' motion to

This leaves Respondents to quibble with word choice. Respondents claim that because John Doe alleges that TikTok shares "aggregated" user data with ByteDance, Petitioner Garrett Reid's personal data was not shared. MTD at 20. What Respondents seemingly want to argue is that TikTok shares "anonymized" user data, but this is not Petitioners' allegation, nor is there evidence to suggest that TikTok does; the evidence rather suggests the opposite.

Respondents finally prevaricate over whether they are to blame for this egregious national security risk. They suggest that it is actually Petitioner Reid who is the problem for using the app while ByteDance still officially owned it. MTD at 23. Petitioner's data, Respondents seem to argue, has already been shared with ByteDance. The problem is that the app continues to track extraordinarily sensitive data, including users' own locations, and shares it with ByteDance. And Respondents caused that harm by approving a divestment that violated the TikTok Law.

---

dismiss and order further factfinding on the scope of TikTok's illegal data-sharing.

The very purpose of the TikTok law was to prevent sensitive American user data from being shared with ByteDance. That is exactly what is happening as a result of Respondents' approval of an illegal deal. This alone is enough to confer standing.

## B.    Petitioners lost money.

Petitioners Tan and Reid invest in competitors to TikTok, while Petitioner Doe invests in ByteDance itself. All lost money because Respondents ignored the law. Am. Pet. ¶ 82–90.

Respondents argue that as shareholders, Petitioners cannot bring a case directly against them, but must do so "derivatively" on behalf of the companies in which they invest. MTD at 10–11. This "prudential shareholder-standing rule" comes from "a strand of the standing doctrine" that generally "prohibits litigants from suing to enforce the rights of third parties." *Collins v. Mnuchin*, 938 F.3d 553, 575–76 (5th Cir. 2019). But for claims under the Administrative Procedure Act ("APA"), like that made against the Attorney General here, "Congress itself has pared back traditional prudential limitations." *FAIC Sec., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985) (Scalia, J.). As then-Judge Scalia explained, the APA was written broadly, to afford "review to any person 'adversely affected or

aggrieved by [federal] agency action within the meaning of a relevant statute.'" *Id.* (quoting 5 U.S.C. § 702 (1982)); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (holding that a "lenient approach [to standing under the APA] is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.").

As a result, "[t]he APA does not abolish the shareholder-standing doctrine. But it limits it in some cases." *Collins v. Mnuchin*, 938 F.3d 553, 575–76 (5th Cir. 2019), *aff'd in part, rev'd in part on other grounds sub nom. Collins v. Yellen*, 594 U.S. 220, 141 S. Ct. 1761, 210 L. Ed. 2d 432 (2021). This is such a case, as courts have permitted shareholder suits under the APA in matters of public policy.

For instance, in *James Madison*, this Circuit permitted shareholders to sue over the appointment of receivers to oversee insolvent banks. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996). In *Collins v. Mnuchin*, the Fifth Circuit permitted shareholders to sue over Fannie Mae and Freddie Mac's placement into conservatorship. (The Supreme Court affirmed in part

and overruled in part the decision, but never questioned the right of shareholders to bring suit. *See Collins v. Yellen*, 594 U.S. 220 (2021)). Unquestionably, whether the President violated the law to create a national security risk with an app that one-fourth of the world uses is one of public interest. Petitioners should be allowed to sue for that reason alone.

The prudential shareholder standing rule is also limited when the company in which the shareholder has invested is unable, legally or practically, to represent itself. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("[W]here officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation.").

That is certainly true of ByteDance, which operates under the single-party rule of Chinese President Xi Jinping. President Trump made clear that President Xi approved the deal, even if Xi did not approve of the original TikTok Law itself. Am. Pet. ¶ 44 (citing Donald Trump (@realDonaldTrump), Truth Social (Jan 22, 2026, 9:52 PM) ("I would also like to thank President Xi, of China, for working with us and, ultimately, approving the deal. He could have gone the other way,

but didn't, and is appreciated for his decision."")). ByteDance and its executives cannot safely challenge the decision of their authoritarian leader. Because ByteDance cannot safely bring a case itself, it falls to its owners like Petitioner John Doe, who live outside of China, to do so.

The cases Respondents cite to the contrary are inapt. Three of the cases—*Bronner*, *Exxon*, and *Franchise Tax Board*—concern suits against private parties, for which the APA does not apply. MTD at 10–11, 16. The only case against the government that Respondents cite, *Pittsburgh & West Virginia Railway Company,* is from 1930, before the APA was passed. In other words, none of the cases address whether, in certain circumstances, shareholders may sue the government.

The same considerations that counsel permitting standing under the APA apply to Petitioners' ultra vires claim. "Literally translated, the Latin phrase 'ultra vires' means 'beyond the powers (of),' and as a legal term, the phrase means 'unauthorized' or 'beyond the scope of power allowed or granted by law.'" *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (cleaned up) (quoting Black's Law Dictionary 1755 (10th ed. 2014)). To succeed on an ultra vires claim, Petitioners

must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (internal quotation marks omitted). Most recently, the Supreme Court affirmed the Court of International Trade's decision invalidating the Trump Administration's tariffs on ultra vires review. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369–70 (Ct. Int'l Trade), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res., Inc. v. Trump*, —— U.S. —— (2026).

At bottom, both the APA and ultra vires causes of action seek to compel the government to follow its own laws. In matters of public importance, and in cases where companies cannot practically bring suit themselves, the prudential shareholder standing rule can and should be used to rein in a government that breaks its own laws.

Respondents argue that, even if Petitioners can bring suit, their losses are too speculative to confer standing. Oddly, Respondents

initially argue that courts categorically do not consider cases where stock values fall: "The speculation inherent in disentangling the causes of stock price fluctuations underscores why courts decline to adjudicate such disputes." MTD at 13. Of course, courts adjudicate this all the time. *See, e.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 99 (D.C. Cir. 2015) (noting that proof of loss causation is an element in securities fraud cases); *Liberty Prop. Tr. v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009) (holding that allegations of loss causation were adequately pled in securities case).

The harms to Petitioners' investments were the predictable result of Respondents' actions. Where harm involves the actions of third parties, a petitioner must present facts "showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477–78 (D.C. Cir. 2009). The government is frequently found liable when its actions predictably hurt the value of companies. *See, e.g.*, *Block v. Meese*, 793 F.2d 1303 (D.C.Cir.1986) (finding a film distributor had standing to challenge the government's classification of certain films as "political propaganda," plaintiff's customers would potentially

23

decline to take a film because of the classification); *Tozzi v. HHS*, 271 F.3d 301 (D.C. Cir. 2001) (manufacturer had standing to challenge the government's classification of dioxin as a carcinogen, because the government's statement would affect demand for the plaintiff's product); It is the same here. When investors believed that the TikTok law would be enforced, stock in TikTok's competitors went up. Am. Pet. ¶¶ 83–87. When investors believed that the law would not be enforced, stock in TikTok's competitors went down. *Id.* Similarly, when ByteDance was forced to sell its most valuable asset—TikTok's American operations—at a price deemed "daylight robbery," its value became less than it would otherwise be. *Id.* at ¶¶ 88–90.

Respondents argue that even if there is predictable harm from their actions, there's no reason to believe Petitioners would benefit if Respondents had to follow the law. MTD at 14. There is. One does not have to believe that markets are always perfect to believe that bad news generally hurts companies, while good news helps them. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) ("That the price of a stock may be inaccurate does not detract from the fact that false statements affect it, and cause loss." (cleaned up)). Just as Respondents' violation of the law hurt the stock of ByteDance and

its competitors, it is reasonable to conclude that Respondents' compliance would help them. *See* Am. Pet. ¶¶ 83-90.

Finally, Respondents also allege that "it is hypothetical that ByteDance would receive another approvable deal consistent with protecting the United States' national security on terms acceptable to ByteDance that would increase the company's value by even greater margins." It is not hypothetical. Petitioners alleged that in fact there was just such a deal offered, and that the President rejected it for a deal that helped his political and personal benefactors. Am. Pet. ¶¶ 63–75.

In all these critiques, Respondents are not challenging whether Petitioners have plausibly alleged that they have standing, but rather the strength of Petitioners' argument. In essence, they are trying to litigate the facts in this case. Doing so is premature, and evidence of why this case must proceed past a motion to dismiss.

## CONCLUSION

The fundamental question Respondents ask is if they can ignore the law and endanger national security and people like Petitioners without consequence. The question answers itself. Because Respondents have so blatantly violated the law, and because

Petitioners have been harmed as a result, this Court should deny Respondents' motion to dismiss.

Respectfully submitted this 1st day of June, 2026,

*/s/ Brendan Ballou*

**PUBLIC INTEGRITY PROJECT**
Brendan Ballou
D.C. Bar No. 241592
Samuel T. Ward-Packard
D.C. Bar No. 90005484
ballou@publicintegrityproject.org
wardpackard@publicintegrityproject.org
(917) 684-3900

*Counsel for Petitioners*

26

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 1, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Brendan Ballou*

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,842 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Century 14-point font, a proportionally spaced typeface.

Respectfully submitted,

*/s/ Brendan Ballou*