**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-1047**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ZHAOCHENG ANTHONY TAN, et al.,
Petitioners,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
Respondents.

———————————

On Petition for Review of Agency Action

———————————

**REPLY IN SUPPORT OF MOTION TO DISMISS
PETITION FOR REVIEW**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

**TABLE OF CONTENTS**

<u>**Page**</u>

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................. 2

I.     The Petition for Review Is Untimely ............................................ 2

II.    Petitioners Lack Standing to Bring their Challenge ............................... 5

       A.     The Shareholder Theories Are Untenable ........................................5

       B.     The Data-Sharing Theory Is Untenable .........................................10

CONCLUSION ...........................................................................................14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                               **Page(s)**

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..................................................................................................12

*Block v. Meese,*
  793 F.2d 1303 (D.C. Cir. 1986) ................................................................................9

*Center for Biological Diversity v. U.S. Dep't of Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ..................................................................................9

*Collins v. Mnuchin,*
  938 F.3d 553 (5th Cir. 2019) (en banc),
  *aff'd in part, vacated in part, rev'd in part sub nom.*
  *Collins v. Yellen,* 594 U.S. 220 (2021)....................................................................7

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ..................................................................................................6

*Enbridge Energy LP v. Nessel,*
  146 S. Ct. 1074 (2026) ..............................................................................................4

*FDA v. R. J. Reynolds Vapor Co.,*
  606 U.S. 226 (2025) ...............................................................................................6, 7

*Franchise Tax Bd. v. Alcan Aluminium Ltd.,*
  493 U.S. 331 (1990) ...........................................................................................6, 7, 8

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.,*
  2026 WL 1593307 (U.S. June 4, 2026) ..............................................................10, 13

*James Madison Ltd. v. Ludwig,*
  82 F.3d 1085 (D.C. Cir. 1996) ..................................................................................7

*NRDC v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ....................................................................................4

*Pace v. DiGuglielmo*,
   544 U.S. 408 (2005) .............................................................................4, 5

*Pileggi v. Washington Newspaper Publ'g Co.*,
   146 F.4th 1219 (D.C. Cir. 2025).............................................................11

*Tozzi v. HHS*,
   271 F.3d 301 (D.C. Cir. 2001) ...................................................................9

**Statutes:**

Protecting Americans from Foreign Adversary Controlled Applications Act,
   Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024)................................................2
      § 3(a), 138 Stat. at 959-60 ...........................................................................2
      § 3(c)(2), 138 Stat. at 960 ........................................................................2, 5

28 U.S.C. § 2401(a).............................................................................................5

**Regulatory Materials:**

Exec. Order No. 14,352, 90 Fed. Reg. 47,219 (Sep. 25, 2025) ........................3, 4

**Other Authorities:**

Donald J. Trump (@realDonaldTrump),
   Truth Social (Jan. 22, 2026, 9:52 PM),
   https://truthsocial.com/@realDonaldTrump/posts/115942147803684675......3

## INTRODUCTION

Petitioners' opposition cannot rehabilitate the two independent fatal flaws in their petition.  First, unable to deny that they filed their petition too long after the President's Executive Order made the statutory findings to allow the divestment of TikTok, petitioners point to a social-media post that had no legal effect.  A petition filed well after the limitations period had run on the relevant government action is untimely.

Second, petitioners abandon some of their standing theories and fail to justify the others.  They do not dispute that shareholders generally cannot assert the rights of corporations, and instead point to inapposite cases involving unusual interests asserted by shareholders.  Petitioners likewise provide no precedent for the speculation piled upon speculation that would be required to attribute fluctuations in stock prices to the challenged government action.  Nor can petitioners support standing by leveraging an allegation that TikTok shares aggregated data into an assertion that an individual user's data will be shared in a way that harms him, much less that any such harm arises from the government's approval of the divestment.

## ARGUMENT

## I.    The Petition for Review Is Untimely

This Court has jurisdiction over challenges to "action[s], finding[s], or determination[s] under" the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, § 3(a), 138 Stat. 955, 959-60 (2024) (Act).  Parties must bring any claim "not later than 90 days after the date of" the challenged "action, finding, or determination."  Act § 3(c)(2), 138 Stat. at 960.  The petition here was filed in March 2026, more than 90 days after the President's determination in September 2025 that the sale at issue would constitute a "qualified divestiture" under the Act.  *See* Mot. 8-9.  The petition is thus untimely and should be dismissed.

Petitioners mistakenly suggest that they can challenge a January 2026 social-media post by the President.  That post—which petitioners tellingly do not quote in their opposition—states in its entirety:

> I am so happy to have helped in saving TikTok!  It will now be owned by a group of Great American Patriots and Investors, the Biggest in the World, and will be an important Voice.  Along with other factors, it was responsible for my doing so well with the Youth Vote in the 2024 Presidential Election.  I only hope that long into the future I will be remembered by those who use and love TikTok.  Thank you to Vice President JD Vance, and all of the others within my Administration, who helped bring this Deal to a very dramatic, final, and beautiful conclusion.  I would also like to thank President Xi, of China, for working with us and,

2

> ultimately, approving the Deal.  He could have gone the other
> way, but didn't, and is appreciated for his decision.
> PRESIDENT DONALD J. TRUMP

Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 22, 2026, 9:52 PM), https://truthsocial.com/@realDonaldTrump/posts/115942147803684675.

It should be clear that the post reflects no Presidential action, finding, or determination under the Act.  Instead, it simply announces that the implementing agreements have been finalized.  *See* Mot. 8.  The legally operative determination occurred in September 2025, when the President issued an Executive Order stating: "I have determined that the divestiture outlined in the Framework Agreement constitutes a 'qualified divestiture' under the Act[.]"  Exec. Order No. 14,352, § 4, 90 Fed. Reg. 47,219 (Sep. 25, 2025).  Petitioners cannot wave away that formal determination as merely "conditional."  Opp. 9.

Relatedly, a successful challenge to the social-media post would have no practical effect.  The post was not necessary for the transaction to take effect, and judicial relief against the social-media post would do nothing to disturb the transaction.  Petitioners would need relief against the Executive Order, but they filed too late to obtain such relief.

Nor does it matter that the President "retained the authority," Opp. 9, to amend his September 2025 determination.  The fact that "*any*" Executive "action is *always* subject to displacement by a future" action, *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020), neither renders every action tentative nor excuses parties from filing challenges within the prescribed limitations period.  If the President had in fact amended his determination, his new determination would be subject to challenge by proper parties within 90 days.  But he did not do so.

Unable to identify any challengeable action within the limitations period, petitioners claim that ripeness and finality doctrines would have prevented them from challenging the September determination within the 90-day period.  Opp. 10-12.  That is not at all clear—the Executive Order specified parameters of the framework agreement, *see* Exec. Order No. 14,352, § 1, and petitioners' ultra vires claims against the President would not even be subject to the APA's finality requirement.  Regardless, plaintiffs' arguments sound in equitable tolling.  But they develop no argument that the Act's deadline is susceptible of equitable tolling, *cf. Enbridge Energy LP v. Nessel*, 146 S. Ct. 1074, 1081-82 (2026), or that the requisite "diligen[ce]" and "extraordinary circumstance[s]" support tolling, *Pace v. DiGuglielmo*,

4

544 U.S. 408, 418 (2005). Indeed, the Act's limitations period expressly runs from "the date of" the challenged "action, finding, or determination," Act § 3(c)(2), 138 Stat. at 960—not from some potentially later date, such as when "the right of action first accrues," 28 U.S.C. § 2401(a). And in any event, although petitioners' standing allegations fail on their own terms, petitioners fail to explain why they had to wait to file their challenge when, on their own theory, the President's September 25 action had an immediate negative effect on stock prices. *See* Am. Pet. 34-35.

## II.     Petitioners Lack Standing to Bring their Challenge

Petitioners' initial and amended petitions advanced a jumble of standing theories, *see* Mot. 6-7, but their opposition defends only two: (1) standing as shareholders in various corporations, *see* Opp. 18-25, and (2) petitioner Reid's standing as a TikTok user based on a risk that his data will be shared, *see* Opp. 13-18. Neither theory is viable.

### A.     The Shareholder Theories Are Untenable

Petitioners do not cast doubt on either of the two independent grounds that preclude standing based on petitioners' ownership of shares "in competitors to TikTok"—Alphabet Inc. and Meta Platforms, Inc.—or "in ByteDance." Opp. 18. First, a corporation's shareholders may not assert

5

harms allegedly suffered by the corporation itself. *See* Mot. 10-11. Petitioners acknowledge this rule and its origins in third-party standing doctrine, *see* Opp. 18, but nonetheless urge this Court to disregard this "longstanding equitable restriction" in this case, *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). Courts do not "lightly impl[y]" such "a major departure from the long tradition of equity practice." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (quotations omitted).

Nothing in the Act's text indicates that Congress intended to abrogate the normal shareholder rule. The Act is focused on protecting national security and the privacy of American citizens. It nowhere suggests any alteration of the background rule that shareholders may not sue to vindicate the legal rights of the corporations in which they own stock.

Petitioners advocate for a different result because they purport to rely on the APA for certain of their claims. Opp. 18. Putting aside questions about the extent to which the APA applies in the context of this unique statutory scheme, for APA claims courts determine the class of persons who can sue not based on "the APA itself," but rather based on "the statute under which the relevant agency acted." *FDA v. R. J. Reynolds Vapor Co.*,

606 U.S. 226, 232 n.4 (2025). And here, again, the Act contains no language signifying a deviation from ordinary shareholder rules.

The cases that plaintiffs cite (Opp. 19-20) engaged in precisely this analysis—they examined the underlying statute to allow certain APA claims to proceed. *See Collins v. Mnuchin*, 938 F.3d 553, 574-76 (5th Cir. 2019) (en banc), *aff'd in part, rev'd in part, vacated in part sub nom. Collins v. Yellen*, 594 U.S. 220 (2021); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092-95 (D.C. Cir. 1996). Neither case stands for the startlingly broad proposition that shareholders may obtain APA and ultra vires review "[i]n matters of public importance." Opp. 22. To the contrary, one of the cases expressly rejected the idea that "any shareholder may obtain review of agency action affecting his holdings." *Collins*, 938 F.3d at 576. And the other allowed a holding company to resist the appointment of a receiver with the authority to liquidate the institutions in which it sought to maintain control, *see James Madison*, 82 F.3d at 1091—hardly an endorsement of the view that any shareholder can challenge any action that affects the company's bottom line.

Courts occasionally excuse the prohibition on shareholder suits when "the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd.*,

493 U.S. at 336.  Here, petitioners do not claim any such basis as to Alphabet or Meta, and their assertion that ByteDance "cannot safely bring a case itself" because the Chinese President "approved the deal," Opp. 20-21, is meritless.  If ByteDance thought the transaction was unwise, it could simply decline to consummate the deal.  Petitioner Doe cannot leverage his disagreement with ByteDance's decision to move forward with this particular deal into a challenge to the government's determination that the deal is permitted.  *See* Mot. 16.  And in any event, political considerations may play a role in corporate decisionmaking, and petitioners offer no reason to doubt that ByteDance viewed the deal as serving the company's interests.

Second, and separately, petitioners' shareholder theory fails because their alleged injuries are too speculative to be cognizable.  Petitioners Tan and Reid do not contend that the challenged regulatory actions involving TikTok directly injured them—rather, they allege incidental effects on companies that compete with TikTok, like Alphabet and Meta, in which petitioners own stock.  *See* Mot. 11-14.  Petitioners do not even purport to identify a case where a court found standing based on such a tenuous series of inferences premised on the independent decisions of third parties.

8

The best petitioners can muster (Opp. 23-24) are cases where companies claimed that government actions classifying their products as "political propaganda" or as "known human carcinogen[s]" would affect their profits, *see Tozzi v. HHS*, 271 F.3d 301, 307-10 (D.C. Cir. 2001); *Block v. Meese*, 793 F.2d 1303, 1307-09 (D.C. Cir. 1986). Those cases do not support an assertion of standing on the premise that government actions directed at one company will have ripple effects on the stock prices of other companies in the marketplace based on reactions and predictions by countless stakeholders with different investment goals and strategies. Petitioners cannot show that "those third-party choices have been or will be made in such manner as to produce causation and permit redressability." *Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (alterations and quotations omitted).

Petitioners' other arguments are unavailing. The fact that courts assess causation and loss in evaluating securities-fraud claims, *see* Opp. 23, does not make it any less speculative that a government action with respect to a company's competitor had a trickle-down effect on stock value. While petitioners maintain that certain changes in Alphabet's and Meta's stock price must have been caused by specific enforcement decisions, *see* Opp. 24,

9

they do not even attempt "to rule out obvious alternative explanations," *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 2026 WL 1593307, at *6 (U.S. June 4, 2026) (alterations and quotations omitted); *see* Mot. 12-13.

Petitioners simultaneously claim that the government's actions harmed not only ByteDance's competitors, but also ByteDance itself. In addition to underscoring the conjecture inherent in petitioners' standing theories, *see* Mot. 14-16, that argument is flawed on its own terms. The idea that the approval harmed ByteDance's stock value because ByteDance could have accepted a better deal, *see* Opp. 24-25, glosses over the decision by an independent actor—namely, ByteDance—to pursue this deal. And it ignores that ByteDance could only benefit from the approval, which allowed—but did not require—ByteDance to consummate the deal. Petitioners also lack foundation for their assumption that a more favorable deal consistent with national security would be readily offered, approved, and accepted.

### B.    The Data-Sharing Theory Is Untenable

Petitioners fare no better in asserting standing based on their late-breaking concern that TikTok will share petitioner Reid's data with ByteDance. Petitioners can only speculate that Reid's individualized, sensitive data will be shared with ByteDance or misused. And even if they

could establish the requisite imminent risk of such an injury, they fail to demonstrate that it would be traceable to the federal government's conduct or redressable in this case. *See* Mot. 19-24.

Petitioners spend pages seeking to substantiate their allegation that "TikTok shares 'aggregated' user data with ByteDance." Opp. 17. But that misses the point. Nothing about that allegation (or the generalized support provided for it) offers any non-speculative reason to conclude that TikTok will imminently share Reid's specific individualized or sensitive data with ByteDance, or that ByteDance will use Reid's data in some unspecified way to concretely injure him.

Petitioners' opposition only highlights another critical problem in their theory of injury. According to petitioners, TikTok's privacy policy makes clear that it may share user data with ByteDance. Opp. 15-16. But petitioners cite no authority to support the remarkable proposition that a consumer suffers a cognizable injury when he knowingly provides his data to a company that shares the data with corporate affiliates in accordance with a privacy policy. *Cf. Pileggi v. Washington Newspaper Publ'g Co.*, 146 F.4th 1219, 1227-31 (D.C. Cir. 2025) (suggesting that a plaintiff may suffer a cognizable injury when his data is shared "without consent").

11

Regardless, petitioners' single-paragraph response to the traceability and redressability problems identified in the government's motion is unavailing. Opp. 17. As to traceability, petitioners have no answer to the fundamental point that their asserted injury is directly caused by TikTok's and ByteDance's independent choices—and Reid's own choice to use TikTok—not by the government's actions. Petitioners state that the government "caused th[e] harm by approving" TikTok's divestment, Opp. 17, but they do not meaningfully dispute that the data-sharing long predated that divestment or contend that the divestment has led to more, or more harmful, data sharing. And petitioners nowhere assert, much less show, that the government's conduct has had the "determinative or coercive effect" on TikTok and ByteDance that would be required to support traceability. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

Although petitioners assert that Reid's injury remains redressable because TikTok "continues to track" users' data, Opp. 17, petitioners identify no reason to believe that the data that TikTok will collect on Reid in the future will differ in any material way from the data that TikTok has already collected—and, on petitioners' view, likely shared with ByteDance—over the years that Reid has used the application. Any such concern would be

substantially undercut by Reid's own independent choice to continue using TikTok.

Because petitioners' standing theories fail as a matter of law, this Court should dismiss the petition. There is no need for "factual development on the [standing] issue," Opp. 7, in addition to questions about appropriate procedures and record disputes. Where, as here, the allegations are plainly insufficient, petitioners are not entitled to "proceed to discovery," *Hikma*, 2026 WL 1593307, at *6, even in cases where discovery would be available as a matter of course if the action proceeded past the pleading stage.

# CONCLUSION

For the foregoing reasons and the reasons in the government's motion, the Court should dismiss the petition for review.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

*/s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

June 2026

14

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,593 words.  This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ *Brian J. Springer*
Brian J. Springer